STATE OF NORTH CAROLINA v. FERNANDO HUNT

No. 43

(Filed 6 June 1975)

1. **Criminal Law § 66— in-court identification — suggestive pretrial procedures — reliable identification — independent origin**

    In a prosecution for rape, felonious assault and armed robbery, pretrial identification procedures were suggestive where defendant was exhibited singly to the victim through a one-way mirror and defendant was the only person who appeared in all of the photographic, showup and lineup identification procedures; however, the totality of circumstances discloses that the victim's identification of defendant was reliable, the court's determination that the victim's in-court identification of defendant was of independent origin was supported by the evidence, and the in-court identification was properly admitted in evidence where the *voir dire* evidence showed that the victim was with her assailant for about 20 minutes, at times in close proximity at a place where interior and exterior lights made identification possible, the victim's description of her assailant's facial characteristics permitted a police specialist to prepare an adequate composite picture of defendant, the victim was able to describe differences in the hair and beard of defendant as she viewed him at the showup, lineup and trial as compared with his appearance on the day she was attacked, and only a month passed between the day of the attack and the victim's positive identification of defendant at the lineup.

2. **Criminal Law § 85— character witness — cross-examination — specific acts of misconduct by defendant**

    In this prosecution for rape, felonious assault and armed robbery wherein defendant did not testify, the court erred in permitting the solicitor to ask defendant's character witness on cross-examination whether he knew defendant had served time and was on probation for other crimes, including assault, and whether he would have testified to defendant's good character if he had had such knowledge, and such error was not cured when the court on the following day instructed the jury to disregard the solicitor's questions to the witness.

Justice COPELAND dissents.

State v. Hunt

ON *certiorari* to review the trial before *Martin (Robert M.)*, *S.J.*, at the 10 June 1974 Session of VANCE County Superior Court.

Defendant was tried upon three separate indictments charging rape, armed robbery, and assault with a deadly weapon with intent to kill inflicting serious injury. The cases were consolidated for trial, and defendant entered a plea of not guilty to each charge.

The State's evidence tended to show the following facts:

Janet Wynn, a telephone operator, testified that on the morning of 29 December 1973 she received a call from a person who stated that she had been attacked and needed help. The caller was incoherent, but she managed to understand that the person was calling from the Marguerite Trailer Park.

Lonnie Luce, General Manager of Lake Marguerite Mobile Home Park, stated that on the morning of 29 December 1973 he received a call from a telephone operator telling him that assistance was needed at one of his units, which the operator thought was No. 27. He and his father proceeded to that number, arriving about 8:20 a.m., and upon finding no need for assistance at that location, proceeded to Unit No. 17, where they knocked on the door several times. They heard a moaning sound from inside the trailer, and, using a pass key to enter the trailer, they found Betty Sue Ratts. She told them that she had been attacked and raped by a black man. Miss Ratts was badly beaten about the face. The witness sent his father to call an ambulance and to notify the Sheriff.

The prosecutrix, Betty Sue Ratts (now Wright), testified that on the morning of 29 December she was awakened about 7:00 a.m. by a knock on the front door. She asked who it was, and a voice answered "Your neighbor." She asked what he wanted, and he first told her that he needed a plunger to unstop his commode. She replied that she did not have one, and he then asked for some grease, something like Crisco. She took a can of Crisco from her kitchen cabinet and returned to the door, but she was unable to get the can through the door because of the latch chain. She thereupon removed the chain, and at that time she saw a man outside pointing a gun toward her. He came into the trailer, and she begged him not to hurt her. He told her to get her money, and she went into the bedroom where she had been sleeping and turned on the light to take

the money from her pocketbook. She handed him about twenty or thirty dollars, and at that time she "got a good look at him." She said that she was able to identify the man who came into the trailer. Upon defendant's motion to suppress any evidence of identification by this witness, the trial judge conducted a *voir dire* hearing and at the conclusion of the hearing overruled defendant's motion to suppress. The evidence elicited on *voir dire* and the trial judge's ruling will be more fully set forth in the opinion.

The jury returned to the courtroom, and the prosecuting witness, continuing, testified that after she gave him the money, he inquired whether they were alone. Although she answered in the affirmative, he searched each room to ascertain whether she had answered truthfully. He told her to go to the back bedroom, where he made her lie on the bed and proceeded to rape her. He then made her turn on her stomach, removed his belt, put it around her neck, and choked her until she finally passed out. When she regained consciousness, she managed to crawl to the telephone and ask the telephone operator for help. While she was in the hospital, she described her assailant to a man who made a composite picture of her assailant according to her description. She stated that she was in the presence of defendant for at least twenty minutes, and "during that time we could see each other well." She described her assailant as being of medium build with an Afro haircut and positively identified defendant as the man who raped her on 29 December 1973.

Dr. Beverly Tucker testified that he saw Miss Ratts (now Mrs. Wright) in the emergency room in Maria Parham Hospital about 9:00 on the morning of 29 December 1973. At that time she had multiple abrasions and contusions of the face and head, a laceration from mid-forehead to the mid-part of the bridge of her nose, swelling which completely closed her right eye, and numerous abrasions on her feet and ankles. Tests revealed the presence of live sperm in the vaginal pool. Fecal matter found on her body and clothes indicated that she had become unconscious or suffered a severe fright causing loss of bodily functions. The doctor also testified, under proper limiting instructions, to statements made to him by prosecutrix which substantially corroborated her testimony.

A composite picture made by a special agent of the SBI from a description given to him by the prosecuting witness was admitted into evidence for the purpose of illustration.

Joe Momier, a special agent with the SBI, testified that, on 3 January 1974, he visited the trailer of one Sandra Reavis, which was located about 200 feet from the trailer of prosecutrix. On that occasion a male person, later identified as defendant, answered the door, and Sandra Reavis introduced him as her brother. Agent Momier also testified that defendant voluntarily came to the Vance County Sheriff's Department on 5 January 1974 and made certain statements. Upon defendant's objection to admission of these statements, Judge Martin conducted a *voir dire* hearing and admitted the statements into evidence after finding that they were voluntarily made. Mr. Momier then stated that defendant initially told him that on 28 December he was not in the Marguerite Trailer Park but that he was in the park on 29 December. He later told them that he was also in the park on 28 December and that he had spent the night at Sandra Reavis's trailer on at least one occasion.

Roger Davis, an officer of the North Carolina Department of Motor Vehicles License and Theft Division, testified that on 3 January 1974, he received a radio call from Agent Momier stating that they had some suspects in the Reavis trailer under surveillance. Momier asked him to stop a 1956 blue Chevrolet when it left the trailer park. The witness complied with this request and found four occupants, including defendant, in the car. At that time he observed defendant's hands. There were scabbed-over scratches on both hands in the general pattern of claw marks. The witness further noted that defendant was starting a mustache and goatee, which at that time were "very light. You could just tell it was starting." The individual with scratched hands identified himself as Fernando Hunt. Agent Momier, recalled, corroborated Davis's testimony with regard to the beginning of a mustache.

The State rested, and defendant offered evidence, in substance, as follows:

Wilbert Hargrove and Ronald Hargrove both stated that there was a "get together" at Sandra Reavis's trailer on the night of 28 December 1973. Defendant left them at the Beacon Light Apartments about 10:30 p.m., and they did not know where he went after that time.

Geneva Wright Fuller testified that on the night of 28 December 1973 defendant, who was engaged to marry her fifteen-year-old daughter, came to her house between 10:30 and

11:00 and accompanied her young daughter to her older daughter's house to baby-sit. She saw defendant on the next morning and did not observe any scratches on his hands or face.

Annette Fuller testified that defendant was with her at her sister's house on the night of 28-29 December 1973. They watched television until her sister and her brother-in-law came in about 1:30, and at that time she and defendant went to bed on the sofa bed in the living room, where they slept or made love all night. She further said that she braided his hair while they were baby-sitting and that defendant had always had a mustache and beard as heavy as he had at the time of the trial. She specifically stated that defendant was with her at 7:00 a.m. on the morning of 29 December 1973.

Faye Rose Crocker, Annette Fuller's older sister, gave testimony which tended to corroborate the testimony of her sister. Her husband, Tyrone Crocker, also gave corroborative testimony and in addition stated that he observed defendant and Annette in bed together about 8:35 a.m. on the morning of 29 December 1973.

Defendant presented evidence of his good character which will be more fully considered in the body of the opinion. The jury returned a verdict of guilty as to all charges.

Defendant gave notice of appeal but failed to perfect the appeal within time allowed. We allowed *certiorari* on 14 October 1974 as to the charge of rape, and on 4 February 1975, pursuant to G.S. 7A-31, we certified the charges of armed robbery and assault with a deadly weapon with intent to kill inflicting serious injury to this Court for review before determination by the Court of Appeals.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Rafford E. Jones, for the State.*

*James W. Smith for appellant.*

BRANCH, Justice.

Defendant assigns as error the trial judge's denial of his motion to suppress the in-court identification testimony of the prosecuting witness, Betty Sue Ratts Wright. Upon defendant's motion to suppress, the trial judge excused the jury and con-

ducted a *voir dire* examination which disclosed the following relevant facts:

The prosecutrix testified that she knew the defendant to be the man who assaulted her "from the identification of what I saw that morning." She further testified that she originally looked at some pictures of suspects, including defendant, but was unable to identify anyone positively. She told them that she thought defendant was the man but could not be sure until she saw him in person.

On 9 January defendant was in a room with a probation officer, and the prosecutrix observed him through a one-way mirror. At that time he was sitting down, had his hair braided, was wearing a cap, and did not speak. Apparently, at this time defendant was unaware that he was being observed. The prosecutrix told the officer that she thought that defendant was the man but could not be sure unless she heard him speak and saw him under substantially the same lighting conditions as existed on the morning of the assault.

About a month later she saw defendant in a lineup with eight other people, and she described the differing conditions at this second observation:

" . . . The difference in the first lineup as opposed to the second lineup is that in the second lineup, he looked almost like he does now. In the first one, he had on a toboggan hat pulled down and he had his hair braided, he was sitting, and there was another man in the room in front of him and I couldn't see him all the time. Plus, I was looking through a one-way mirror and he was lot further away than he was at the second lineup.

"I don't remember whether I asked the Sheriff or detective to have him stand up or have all of them stand up at the first lineup, but I told them at that time that I could not make an identification unless I heard him talk and stand. . . . "

She testified that she had a chance to observe his face at intervals of a minute several times during the twenty minutes or so he was in her trailer on the morning of the incident. She further stated that there was sufficient light from street lights shining into the trailer to make an identification, particularly since, when she observed his face, he was within one foot of her.

Testimony of law enforcement officers indicated that defendant was fully informed of his rights as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694, and that he understandingly and voluntarily waived the presence of counsel at the lineup.

Bobby Hamm of the Vance County Sheriff's Department testified that at the second encounter each of the men was required to say three phrases: "This is your neighbor."; "Do you have any grease?"; and "Would you take me to Raleigh?". He then described Mrs. Wright's reaction during the second confrontation:

> " . . . Mrs. Wright was standing right beside me in front of each man as he made the statements, approximately two feet from them. She didn't change at the moment when he made the statements; she listened to the rest of them. He was the third man who made the statements. Her face became flushed, that was all. She identified the man as being the man who attacked her. I was present when he was warned of his constitutional rights and when he was advised if he could not afford an attorney one would be provided for him. He voluntarily stood in the lineup. . . . "

Defendant testified on *voir dire* that he had no recollection of being warned of his rights and that, after his initial refusal to stand in a lineup, the police told him that he had to do so. Recalled, prosecutrix stated that she was "not sure if I could identify him today if he was dressed differently."

At the conclusion of the *voir dire* hearing, Judge Martin made the following findings of fact and conclusion of law:

> "THE COURT: The Court finds that Mrs. Wright, formerly Miss Ratts, spent a considerable period of time with her assailant up to at least twenty minutes; that she was with him under adequate artificial interior and exterior light in her trailer and, on several occasions was facing her assailant their heads being approximately a foot apart, facing him directly and intimately; that in Court Mrs. Wright pointed to the defendant Hunt as the one who raped her in her home on the twenty-ninth day of December, 1973; that Mrs. Wright was positive as to her input identification of the defendant based on what she saw at the time that she was raped and on nothing more; that sometime thereafter,

State v. Hunt

Mrs. Wright was showed photographs of a number of persons and was unable to recognize any photograph as being of the man who raped her; that thereafter, a lineup was conducted in the early part of January, at which time the defendant along with several others, was in the lineup and although she felt almost positive that the defendant was the person who raped her, she was unable to make a positive identification for the reason that she was some distance away looking through a glass and the defendant had on a hat and his hair was braided, and that on the day that she was raped, her assailant did not have on a hat, nor was his hair braided, but that it was an Afro hairdo on the twenty-ninth day of December, 1973. The Court further finds as a fact that on the twenty-eighth day of January, 1974, a lineup was conducted at the Sheriff's office, at which time some persons, all black, including the defendant, was placed in the lineup; that before the defendant was placed in the lineup, he was warned of his constitutional rights under the 'Miranda' decision and was specifically warned that he had the right to have counsel present at the lineup and, if he was unable to do so, the Court would appoint counsel for him; that the defendant knowingly, intelligently, voluntarily and understandingly waived his right to counsel in the lineup and freely consented to participate in the lineup. And the Court finds as a fact that the defendant freely, voluntarily, understandingly, and intelligently waived his right to counsel at the out-of-court confrontation for identification by the prosecutrix. The Court further finds as a fact that the defendant was represented by counsel at the preliminary hearing, and that, at the preliminary hearing, Mrs. Wright identified the defendant as the person who assaulted her at her residence on the twenty-ninth day of December, 1973. The Court finds and determines that, from clear and convincing evidence, the in-court identification of the defendant Hunt is of independent origin based solely on what she saw at the time of the assault and rape and does not result from out-of-court confrontation or from any photograph or from any lineup or any pretrial identification procedures suggestive and conducive to mistaken identification, and the defendant's motion to suppress the testimony as to identification is overruled.

EXCEPTION NO. 1"

Defendant argues that he was denied due process because of suggestive pretrial identification procedures. He points specifically to the fact that he was the only person who appeared in all the pretrial procedures and to the fact that he was exhibited to the prosecuting witness singly. In support of this contention, he relies strongly on *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed. 2d 402 (1969).

In *Foster* defendant was charged with armed robbery, and the only eyewitness to the alleged crime failed to identify defendant at a lineup in which defendant was wearing a leather jacket similar to the one worn by the robber and in which defendant, who was six feet tall, was shown with two people who were about five feet six inches tall. Only a tentative identification resulted from a one-to-one confrontation which took place after the witness requested that he be allowed to speak to defendant. Positive identification occurred at a second lineup with five men in which defendant was the only person who had appeared at the first lineup. At trial the witness testified as to his identification of defendant at the lineup and also made an in-court identification.

In a majority opinion by Justice Fortas, Justices Black, Harlan, White, and Stewart dissenting, the Court held the admission of the identification evidence to be error. The Court, in part, stated:

> "The suggestive elements in this identification procedure made it all but inevitable that David would identify petitioner whether or not he was in fact 'the man.' In effect, the police repeatedly said to the witness, *'This* is the man.' See *Biggers v. Tennessee*, 390 U.S. 404 (dissenting opinion). This procedure so undermined the reliability of the eyewitness identification as to violate due process."

The United States Supreme Court considered a similar question in the case of *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed. 2d 401 (1972). There the defendant was charged with a rape which allegedly occurred on 22 January 1965. The State's evidence, in part, consisted of testimony by the prosecuting witness concerning a pretrial showup during which two detectives walked the defendant by the prosecuting witness, at which time defendant was directed to say "Shut up or I will kill you."

This confrontation occurred on 17 August 1965. At trial, the prosecuting witness testified that she had "no doubt" about her identification. Finding that the testimony was properly allowed to go to the jury, the Court, *inter alia*, stated:

"We turn, then, to the central question, whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include *the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.* . . ." (Emphasis supplied.)

The factors to be considered in evaluating the likelihood of misidentification as enunciated in *Neil* were applied by this Court to the facts in *State v. Henderson,* 285 N.C. 1, 203 S.E. 2d 10. The facts in the case *sub judice,* in *Neil,* and in *Henderson* exhibit striking similarities. In *Henderson* there was no lineup, but there was a showup conducted within twenty-four hours after the crime, at which time the rape victim identified the defendant as her assailant. She did not testify as to the showup at trial, but made a positive in-court identification of defendant as the man who raped her. Finding no error in the admission of the evidence, we stated:

"Since *Mapp v. Ohio,* 367 U.S. 643, 6 L.Ed. 2d 1081, 81 S.Ct. 1684, the general rule has been that evidence unconstitutionally obtained is excluded in both State and Federal Courts as essential to due process—not as a rule of evidence but as a matter of Constitutional law. *State v. Rogers,* 275 N.C. 411, 168 S.E. 2d 345; *State v. Colson,* 274 N.C. 295, 163 S.E. 2d 376. The test under the due process clause as to pretrial identification procedures is whether the totality of the circumstances reveals pretrial procedures so unnecessarily suggestive and conducive to irreparable mistaken identification as to offend fundamental standards of decency, fairness and justice. *Foster v. California,* 394 U.S. 440, 22 L.Ed. 2d 402, 89 S.Ct. 1127; *Stovall v. Denno,* 388 U.S. 293, 18 L.Ed. 2d 1199, 87 S.Ct. 1967; *Rochin v. California,* 342 U.S. 165, 96 L.Ed. 183,

72 S.Ct. 205; *State v. Haskins,* 278 N.C. 52, 178 S.E. 2d 610; *State v. Austin,* 276 N.C. 391, 172 S.E. 2d 507; *State v. Rogers, supra.*

\* \* \*

"The practice of showing suspects singly to persons for purposes of identification has been widely condemned. *Stovall v. Denno, supra; State v. Wright,* [274 N.C. 84, 161 S.E. 2d 581]. However, whether such a confrontation violates due process depends on the totality of the surrounding circumstances. *Stovall v. Denno, supra.*

"We recognize that there are circumtances under which the single exhibition of a suspect may be proper. The landmark case of *Stovall v. Denno, supra,* held that the showing of a single suspect in a hospital room while he was handcuffed to police officers did not violate due process because the possibility of the impending death of the witness required an immediate confrontation. Our Court has held that there was no violation of due process when there were 'unrigged' courtroom and station house confrontations which amounted to single exhibitions of the accused. *State v. Tuggle,* 284 N.C. 515, 201 S.E. 2d 884; *State v. Bass,* [280 N.C. 435, 186 S.E. 2d 384]; *State v. Haskins, supra; State v. Gatling,* 275 N.C. 625, 170 S.E. 2d 593. Similarly we have recognized that a confrontation which takes place when a suspect is apprehended immediately after the commission of the crime may be proper. *State v. McNeil,* [277 N.C. 162, 176 S.E. 2d 732].

\* \* \*

"It is well established that the primary illegality of an out-of-court identification will render inadmissible the in-court identification unless it is first determined on voir dire that the in-court identification is of independent origin. *Wong Sun v. United States,* 371 U.S. 471, 9 L.Ed. 2d 441, 83 S.Ct. 407; *State v. Bass, supra; State v. Austin, supra; State v. Rogers, supra; State v. Wright, supra.*"

[1] A superficial reading of *Foster* and *Neil* gives the initial impression that the Court's holding in *Neil, sub silentio,* reversed *Foster.* See Shapiro, *Searches, Seizures and Lineups,* 20 New York Law Forum 217. However, the cases are readily distinguishable in that in *Foster* the Court did not consider whether the in-court identification was of independent origin. In *Neil,*

State v. Hunt

on the other hand, the central question was "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." We think that the last stated query is the central and decisive question in the assignment of error before us. At the threshold of this question, we concede that the one-to-one confrontation and the showing of defendant in all the pretrial identification procedures were suggestive. We must therefore decide whether the totality of the circumstances discloses reliability of identification. The prosecuting witness had ample opportunity to observe her assailant. The record shows that she was with him for about twenty minutes, at times in close and intimate proximity at a place where the exterior lights made identification possible. She testified, "I got a good look at him when I turned the lights on. . . . The street lights were shining in the room and I could see his face; how tall he was and what size man he was. At the time I observed his face, he was within a foot." Further, her description of his facial characteristics permitted a police specialist to prepare an adequate composite picture of defendant. Her attention to detail was further denoted by the fact she was able to describe differences in the hair and beard of defendant as she viewed him at the showup, lineup, and trial as compared to his appearance on the day that she was attacked.

Certainly the period which elapsed between the day of the attack and the positive identification did not constitute such passage of time as would be conducive to misidentification. Compare *Neil v. Biggers, supra,* where the crime occurred on 22 January 1965, and identification was not finally made until 17 August 1965.

The level of certainty demonstrated by the witness might be questioned because she did not positively identify defendant from photographs. She explained her failure to positively identify defendant from the photographs with these statements: "I wouldn't identify anybody from a picture in anything as serious as this. I told them I thought this was the man but I could not be sure until I saw him in person." The prosecuting witness also failed to identify defendant when she observed him through a one-way mirror as he was sitting in a room in the sheriff's office. In this connection, she said:

" . . . I didn't hear him talk. He had his hair braided. He had a cap on. I told him I thought that was the man, but I

could not be sure unless I heard him talk, unless I saw him in the same light that I saw him that night. . . . "

The prosecuting witness's failure to make a positive identification from photographs or from the showup appears more strongly to evince a commendable resolution to avoid misidentification than to disclose uncertainty of identification.

The trial judge's findings at the conclusion of the *voir dire* as to the admissibility of the identification testimony were supported by clear, competent, and convincing evidence. These findings are, therefore, conclusive and binding on this Court. *State v. Tuggle,* 284 N.C. 515, 201 S.E. 2d 884; *State v. McVay,* 277 N.C. 410, 177 S.E. 2d 874; *State v. Blackwell,* 276 N.C. 714, 174 S.E. 2d 534, *cert. denied,* 400 U.S. 946, 91 S.Ct. 253, 27 L.Ed. 2d 252. These findings, in turn, support the trial judge's conclusion of law that the "in-court identification of the defendant Hunt is of independent origin based solely on what she saw at the time of the assault and rape and does not result from any out-of-court confrontation or from any photograph or from any lineup or from any pretrial identification procedures suggestive and conducive to mistaken identification." *State v. McVay, supra.*

We hold that the trial judge correctly overruled defendant's motion to suppress the identification testimony.

[2]  Defendant next assigns as error the denial of his motion for mistrial based upon improper cross-examination of a defense witness. During the cross-examination of Richard Vaughan, who testified to defendant's good character and reputation, the following exchange occurred between the witness and the assistant solicitor:

"MR. ALLEN: Q. Mr. Vaughan, you say you have known him for a long time?

A. Yes, sir.

Q. Do you know of his police record?

THE WITNESS: Beg your pardon?

Q. Do you know of his police record?

A. No, I don't know about that.

Q. Do you know that he has served time in the penitentiary?

MR. SMITH: Object, Your Honor.

THE COURT: Overruled.

A. No, I didn't know that.

Q. You know he is now on probation—

MR. SMITH: Object, Your Honor.

THE COURT: Overruled.

Q. —for possession of marijuana and assault?

A. I did not know that.

Q. And if you had know [sic] this, you wouldn't have given him the good character and reputation you did, would you?

THE WITNESS: Say that again, please.

Q. If you had known he had served time for burning property and knew that he was now on probation for possession of marijuana and assault, you would not have given him the good reputation that you just gave him, would you?

A. If I had know [sic] that, I couldn't have said that." The Court shortly thereafter adjourned for the day. The following morning, upon the convening of Court, defendant's counsel moved for mistrial. Judge Martin denied the motion but withdrew the challenged testimony from the consideration of the jury under the following instructions:

"THE COURT: Members of the jury, the witness, Richard Vaughan, the last witness who testified for the defendant, and testified as to the general character and reputation of the defendant, was asked a number of questions on cross examination by the Solicitor. The first question asked on cross-examination was: Mr. Vaughan, you say you have known him for a long time. Answer: Yes, sir. Members of the jury, there were a number of other questions asked by the Solicitor of the witness, Richard Vaughan, two of those questions under objection by defendant's counsel, and the Court overruled the objection. I now reverse my ruling and sustain the objection, not only to those two questions, but

I instruct you that you will not consider for any purpose the other questions propounded by the Solicitor. The Court instructs you that you will disregard each of these questions propounded by the Solicitor of the witness, Mr. Vaughan, and erase the matter from your minds. You will. disabuse your minds of those questions on cross examination by the Solicitor of the witness, Richard Vaughan.

"Members of the jury, questions are not evidence. Questions by counsel or by the Solicitor are not evidence, they are simply questions. Evidence is the sworn testimony that comes from the lips of the witnesses on the stand."

It is a well-established rule in this jurisdiction that a character witness may not be asked on cross-examination whether he has heard of particular acts of misconduct by defendant. *State v. Green,* 238 N.C. 257, 77 S.E. 2d 614; *State v. Robinson,* 226 N.C. 95, 36 S.E. 2d 655; *State v. Shinn,* 209 N.C. 22, 182 S.E. 721; *State v. Canup,* 180 N.C. 739, 105 S.E. 322. Nor may such a witness be asked whether he would consider one to have good character who was guilty of such misconduct. *See Woodie v. North Wilkesboro,* 159 N.C. 353, 74 S.E. 924.

Thus, this assignment of error is resolved to the question of whether the withdrawal of this evidence from the jury under proper instructions cured the original error. Normally, where evidence is erroneously admitted but later withdrawn, under instructions by the Court that the jury should disregard such testimony, the error in admission is considered harmless. *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38; *State v. Perry,* 276 N.C. 339, 172 S.E. 2d 541; *State v. Welch,* 266 N.C. 291, 145 S.E. 2d 902. *See generally,* 1 D. Stansbury, North Carolina Evidence § 28 (Brandis Rev.). Justice Seawell, writing for this Court in *State v. Strickland,* 229 N.C. 201, 49 S.E. 2d 469, well stated the test to be applied in such a situation:

"In appraising the effect of incompetent evidence once admitted and afterwards withdrawn, the Court will look to the nature of the evidence and its probable influence upon the minds of the jury in reaching a verdict. In some instances because of the serious character and gravity of the incompetent evidence and the obvious difficulty in erasing it from the mind, the court has held to the opinion that a subsequent withdrawal did not cure the error. But

in other cases the trial courts have freely exercised the privilege, which is not only a matter of custom but almost a matter of necessity in the supervision of a lengthy trial. Ordinarily where the evidence is withdrawn no error is committed. [Citations omitted.]"

Whether instructions can cure the prejudicial effect of such statements must depend in large measure upon the nature of the evidence and the particular circumstances of the individual case. *State v. Aldridge,* 254 N.C. 297, 118 S.E. 2d 766.

*State v. Choate,* 228 N.C. 491, 46 S.E. 2d 476, provides particular guidance in instant case. In *Choate,* the defendant was charged with abortion and murder. Testifying in his own behalf, he denied that he had given the deceased any abortion-inducing medication. On cross-examination the solicitor questioned the defendant in detail about alleged abortions performed on three named women. Defendant replied that he had no knowledge or recollection of having treated any of the women. Subsequently, the State called two of the named women and the mother of the deceased third woman and elicited testimony, over the defendant's objection, that defendant had indeed treated these women. No testimony was elicited as to the precise nature of the treatment. The trial judge limited the testimony to impeachment purposes only. Court was adjourned for the day. Upon the convening of Court on the following morning, the judge ordered the testimony stricken and carefully and fully instructed the jurors that they were not to consider such testimony in reaching their verdict. Defendant was convicted of criminal abortion.

On appeal, this Court reversed on the ground that the rebuttal testimony with regard to treatment of the three named women was so prejudicial to the defendant that no instruction could cure the error. The Court stated:

"... It is apparent that the trial judge, when he reached the conclusion that the evidence was inadmissible, did all that he could do to remove the harmful effect of it. But it had been with the jury over night, and must have found lodgment in their minds. And evidence tending to show that defendant committed other like offenses is calculated to prejudice the defendant in the minds of the jurors, and was not subject to correction. [Citation omitted.] Conviction of a defendant under such circumstances ought not to stand."

To similar effect, *see State v. Gavin*, 232 N.C. 323, 59 S.E. 2d 823; *State v. Broom*, 222 N.C. 324, 22 S.E. 2d 926.

A more recent case reversing a conviction upon similar reasoning is *State v. Aycoth*, 270 N.C. 270, 154 S.E. 2d 59. In *Aycoth*, during the cross-examination of an officer who was a State's witness, counsel for one of the defendants asked whether the witness knew, of his own knowledge, who owned the automobile in the possession of defendants at the time of their arrest for the crime for which they were on trial. The witness replied that Aycoth had said that the car was his at an earlier time "when we arrested him on another charge in his yard. His wife asked me to go search the car and see if I could find some articles that was [*sic*] left in the car setting [*sic*] in the yard, when he was indicted for murder." The Court allowed the motion to strike this unresponsive answer and instructed the jury to disregard such statements relating to the earlier arrest and indictment. Aycoth's motion for mistrial was, however, denied.

On appeal, this Court, quoting and relying upon the above-quoted statement from *State v. Strickland, supra,* held that the prejudicial effect of defendant's statements could not have been erased by the Court's instruction to disregard such testimony.

Both counsel and defendant in a criminal case are always faced with a difficult task in deciding whether the accused should testify and be subjected to cross-examination. Here defendant did not testify. If defendant had a previous criminal record, that fact, in all probability, strongly influenced his decision to forego his right to testify. The effect of the prosecutor's questions was to inform the jury that defendant had previously been convicted of other separate and distinct criminal offenses, including assault. The motion for mistrial was not made until the next day, and after denying the motion, the able trial judge, who had presided with learning and fairness throughout the trial, immediately sought to remove from the minds of the jurors the harmful effect of the incompetent evidence. However, it must be noted that the instructions then given were not specific as to the content of the challenged questions, and by this time the evidence must have found secure lodgment in the minds of the jurors. The questions posed by the prosecutor were loaded with prejudice, and we are of the opinion that under the circumstances of this capital case, the

harmful effect of the evidence could not have been removed by the Court's instruction. For this reason defendant is entitled to a new trial.

We do not deem it necessary to consider the remaining assignments of error since in all probability they will not recur at the next trial.

New trial.

Justice COPELAND dissents.