STATE OF NORTH CAROLINA v. JOHN LEE CLEMMONS

No. 159A86

(Filed 4 March 1987)

**1. Rape and Allied Offenses § 4.1; Criminal Law § 86.5— defendant's prior sexual misconduct—inadmissible to attack credibility—no prejudicial error**

There was no prejudice in a prosecution for first degree rape from the admission of evidence of defendant's prior alleged sexual misconduct where the court refused to admit the testimony under the common plan or scheme exception but permitted the evidence on the express ground that it showed a specific act of misconduct which could be used to attack defendant's credibility when he testified on his own behalf. The evidence was not admissible for that purpose because extrinsic evidence of sexual misconduct is not in any way probative of character for truthfulness or untruthfulness; however, given the evidence as a whole, there is no reasonable probability that the jury would not have convicted the defendant even if this evidence had not been admitted for any purpose. N.C.G.S. 8C-1, Rules 404(b), 608(b).

2. **Rape and Allied Offenses § 6— instruction that knife is a dangerous weapon—not plain error**

     There was no plain error in a prosecution for first degree rape where the trial court instructed the jury that "a knife is a deadly weapon"; even assuming that the evidence did not establish the deadly nature of the knife as a matter of law, defendant did not object and there was no probable impact on the finding of guilt because the jury would have found on the evidence that the knife was a dangerous or deadly weapon or that the victim reasonably believed it to be such. N.C.G.S. 14-27.2(a)(2)(a).

APPEAL by defendant from a judgment entered by *Reid, J.,* at the 2 December 1985 Criminal Session of Superior Court, EDGECOMBE County. Heard in the Supreme Court 10 February 1987.

Defendant was charged with rape in the first degree. The jury found him guilty as charged, and the trial court entered the mandatory sentence of life imprisonment. N.C.G.S. 14-27.2 (1986); N.C.G.S. 14-1.1(2) (1986). Defendant appealed directly to this Court pursuant to N.C.G.S. 7A-27(a) (1986).

*Lacy H. Thornburg, Attorney General, by Steven F. Bryant, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Robin E. Hudson, Assistant Appellate Defender, for defendant-appellant.*

WHICHARD, Justice.

The State's evidence, in pertinent part, showed the following:

The victim first saw defendant about two weeks before the incident alleged when the victim's son "darted out" in front of a car driven by defendant. After defendant ascertained that the boy was not injured, he "started asking [the victim] if [she] was married." She told him she was. Defendant then "started asking if [the victim would] like to go out with him." The victim told defendant she was married and did not want to go out with him, but defendant nevertheless "pursued the issue" by asking her "over again." She then grabbed her son's hand and went home.

The victim next saw defendant the following Wednesday. Her neighbor's child came to tell her that "there was a man out there interested in buying a car." The victim was attempting to sell her brother's car, so she went out to talk to the man. When

she saw the man's car, she realized that he was the defendant. They talked about the car for another "couple of minutes," and defendant then asked "about coming over on Monday" to discuss the car. She told him he would have to come when her husband was there, and defendant said "something like 'Why don't you let me come over?'" She told him he would have to come when her husband was at home, and she then went inside because she "didn't feel comfortable."

The victim saw defendant again the following Monday standing on the porch at his place of employment. She had asked him his name and where he worked so her mother could talk to him further about the car. She showed her mother where defendant worked, and her mother later "went [by] to talk to him."

The victim next saw defendant on the occasion of the incident in question. She was at home with her two children around noon when she heard a knock at the door. When she asked who was there, a man answered that he "had a package for Devlin Dorsey." The victim had a son named Devlin Oyer who frequently received packages from his father, and the difference in the surnames did not occur to her. She opened the door slightly, and defendant "forced his way through." When she screamed, defendant grabbed her year-old daughter and told the victim that if she did not cooperate he would hurt the daughter. Defendant held a knife in his hand that "looked like a switch blade." He took the daughter into a bedroom, where the victim's other child was, and shut the door. When he returned to the living room, the knife was still in his hand. He told the victim they "were going to have some fun." He then pushed her down onto an easy chair, and she "slid down into a half-sitting half-lying position."

Defendant thereupon crouched over the victim, "took [her] robe apart," and "took off [her] panties." He still had the knife in his hand. He told her "it was going to be good" and proceeded to have intercourse with her. The victim stated: "He penetrated, he went inside me." Defendant then arose to go to the bathroom with the knife still in his hand.

When defendant returned, he told the victim "not to go to the police or . . . he would harm [her] daughter." He then told her he would see her again, and he left.

After defendant left, the victim called a friend and told her she had been raped. The friend called the police, and both the friend and the police came to the victim's home. The victim related the foregoing events to the police.

Two days later the victim was admitted to a hospital where she stayed for two weeks under the treatment of a psychiatrist. She was hospitalized because she "couldn't seem to handle things," "felt like [she] was going crazy," "felt like [she] was losing [her] mind." She was unable to take care of her children, her husband or herself.

On cross-examination the victim stated: "I was scared. He had a knife and he was twice the size of me. I don't take chances with my children's lives." She responded in the negative when asked: "Didn't you freely give this man sex?" She further testified that she could see the knife in defendant's hand "the whole time he was there," and that defendant had his hand pressed against her shoulder during the sexual union.

The victim's friend testified, corroborating the victim's testimony that the victim had called her following the incident and said that she had been raped. When she arrived at the victim's home the police were already there. She described the scene at the home as follows: "[T]he place was a wreck like there had been a struggle . . . . There was a lamp tipped over on the floor and things were thrown everywhere."

The victim's sister testified, corroborating the victim's testimony that defendant had been to the victim's home prior to the incident to talk about the car and had asked if he could "come over Monday . . . ." The neighbor's child testified, also corroborating the victim's testimony about defendant's prior visit.

A police officer testified that she saw the victim at the hospital on the date of the incident. She described the victim as "obviously traumatized." She stated: "She was shaking, she had been crying, she was very upset, she appeared to be confused and very frightened." The victim gave the officer a statement on that occasion which corroborated the victim's testimony at trial.

Soong Lee testified as "an expert medical doctor specializing in the field of psychiatry." He indicated that the victim had been brought to the emergency room on 25 June 1985, the day follow-

ing the incident, because "she had passed out." He described her condition upon that admittance as follows: "Recollection of that incident [*i.e.*, the alleged rape] [was] coming back to her mind over and over again and she was unable to function."

Dr. Lee subsequently admitted the victim to the hospital from 26 June through 11 July. His diagnosis was "post traumatic stress disorder." He again indicated that the victim was "having that recollection of the event coming back over and over again." The victim told him that she was "unable to sleep, . . . frightened, . . . afraid that something was going to happen to her." She was "re-experiencing what happened to her and . . . she was unable to function." She was withdrawn and uncommunicative.

On cross-examination defense counsel asked Dr. Lee if marital problems could cause post traumatic stress disorder. He responded: "No, it has to be more acute."

Defendant testified in his own behalf. He admitted that he "ha[d] sex" with the victim, but denied that he carried a knife or used force. He testified that the "sexual relationship [was] by consent" and that he returned to the victim's house on 24 June because she "told [him] to come back then." According to defendant, the sexual union was "both our ideas." Defendant denied taking the victim's daughter to the bedroom and stated that both the victim's children were in the room with them when they "had sex."

Finally, a police officer testified as a witness for defendant. He stated that at some time in June 1985 he had seen the victim at defendant's service station.

The jury returned a verdict of guilty of rape in the first degree. Defendant appeals and presents two arguments.

[1] First, defendant contends the trial court erred in allowing the State to impeach his testimony with evidence of prior alleged sexual misconduct which had no bearing on his credibility. This assignment of error is based upon the following sequence of events at trial:

The State sought to present a female witness to testify that about a year prior to the incident here defendant came to her apartment, made advances toward her, threw her across the bed,

got on top of her, and desisted only when she managed to kick a ringing phone off the hook. The prosecuting attorney represented to the court that this evidence was offered "to show an incident which is similar in nature and indicates an intent and a course of conduct on the part of the defendant." *See* N.C.G.S. 8C-1, Rule 404(b) (1986); *State v. McClain*, 240 N.C. 171, 174-76, 81 S.E. 2d 364, 366-68 (1954). The court "conclude[d] that the prejudicial effect of that testimony would outweigh any probative value," N.C.G.S. 8C-1, Rule 403 (1986), and therefore excluded it.

Subsequently, however, the court allowed the State to cross examine defendant about the incident. The prosecuting attorney asked defendant: "Didn't you go by there [*i.e.*, the female witness' apartment] to forcibly have sex with [her]?" Over objection and a motion for mistrial, which were respectively overruled and denied, defendant responded: "No." He then testified that he went to the witness' apartment to "[r]epair a window." The prosecuting attorney asked: "What happened when you went in?" Upon defendant's objection, the court then instructed the jury as follows:

[T]his line of questioning is permitted only for the purpose of establishing, if it does, in fact, establish a prior motive or prior intent to commit a similar offense. It is not evidence of the defendant's guilt in this case and it shall not be taken by you as such evidence.

After counsel approached the bench, the court indicated that it was going to excuse the jury "to make some findings with regard to legal questions," but before excusing the jury it further instructed as follows:

[T]he questions that [the prosecuting attorney] has asked the witness with regard to any prior act of misconduct with [the female witness] [are] not received for any other purpose other than attacking the credibility of this witness as a witness on his own behalf and it shall be considered by you only for that purpose if, in fact, . . . you find that it does establish some prior act of misconduct which will bear on the credibility of this witness . . . .

After hearing arguments of defense counsel in the absence of the jury, the court agreed to sustain defendant's objection "to the testimony of a prior act—of alleged prior act of misconduct . . .

because the Court . . . found that the prejudicial effect of that testimony outweighed its probative force and effect and therefore, did not permit . . . the State on direct evidence . . . to offer such evidence." The court then stated:

> However, when the defendant takes the stand and places his own credibility in question, then he subjects himself not only to questions about any prior convictions that he may have, but to cross examination as to any specific act of misconduct which the State in good faith may have information that he may be guilty of and it is . . . on that basis . . . that the Court will permit the State to cross examine him as to a specific act of misconduct which the State in good faith has a predicate to base this question upon . . . . So the reason that the Court sent the jury out was so that the record would be clear as to what the Court's ruling was based upon.

The jury then returned and the following occurred:

> Q. [PROSECUTING ATTORNEY]: Mr. Clemmons, I believe you said that you did go to the apartment of [the female witness]?
>
> A. (Nods assent)
>
> Q. When you went to the apartment, did you or did you not throw [the witness] onto the bed and attempt to get on top of her and . . . attempt to have a sexual relationship with her at that time?
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Overruled.
>
> A. No, I didn't.
>
> Q. What happened in the room?
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Sustained as to that.

The State argues that this evidence was admissible "to show an incident similar to the one charged and . . . not too remote in time to establish defendant's intent, plan, motive and cause of conduct." N.C.G.S. 8C-1, Rule 404(b); *see State v. Gordon*, 316 N.C.

497, 505, 342 S.E. 2d 509, 513 (1986) ("This Court has been quite 'liberal in admitting evidence of similar sex crimes' under the common plan or scheme exception."). The trial court, however, expressly refused to admit the evidence for that purpose, both in the State's case-in-chief and on cross-examination of the defendant, on the ground that the prejudicial effect would outweigh any probative value. Exclusion on that basis was within the court's sound discretion. N.C.G.S. 8C-1, Rule 403; *State v. Mason*, 315 N.C. 724, 731, 340 S.E. 2d 430, 434-35 (1986).

The court proceeded, however, to admit the evidence on the express ground that it showed a specific act of misconduct which could be used to attack defendant's credibility when he testified in his own behalf. Specific instances of the conduct of a witness, for the purpose of attacking the witness' credibility, may be inquired into on cross-examination of the witness only if they are "probative of truthfulness or untruthfulness." N.C.G.S. 8C-1, Rule 608(b) (1986). This Court has stated that "extrinsic evidence of sexual misconduct is not in any way probative of a witness' character for truthfulness or untruthfulness." *State v. Gordon*, 316 N.C. at 506, 342 S.E. 2d at 514. *See also State v. Morgan*, 315 N.C. 626, 635, 340 S.E. 2d 84, 90 (1986) ("evidence routinely disapproved as irrelevant to the question of a witness' general veracity (credibility) includes specific instances of conduct relating to 'sexual relationships or proclivities . . . .' "). The evidence in question thus was not admissible for the purpose for which the court allowed it.

Admission of this evidence on an improper ground does not, however, require a new trial. While defendant correctly argues that the trial was largely a credibility contest between him and the victim, our review of the evidence as a whole convinces us that, even absent this evidence, the jury would have believed the victim rather than defendant. Considering the general consistency between the victim's testimony and her pre-trial statements and conduct, the evidence that the victim's house was in disarray following what defendant contended was a consensual sexual union, and particularly the medical evidence of the victim's severe post-traumatic stress disorder for a lengthy period immediately following the incident, we conclude that there is no reasonable possibility that the jury would not have convicted defendant even if the evidence in question had not been admitted for any pur-

pose. Defendant thus has not sustained his burden of showing prejudice. N.C.G.S. 15A-1443(a) (1983). Moreover, we note that defendant answered the accusatory questions in the negative. *See State v. McClintick*, 315 N.C. 649, 660, 340 S.E. 2d 41, 48 (1986); *State v. Black*, 283 N.C. 344, 350, 196 S.E. 2d 225, 229 (1973). This assignment of error is overruled.

[2] Second, defendant contends the trial court erred by instructing the jury that "a knife is a deadly weapon." Defendant did not object to the instruction at trial and thus may not assign it as error on appeal. N.C.R. App. P. 10(b)(2). He urges us, however, to apply the "plain error" rule, *State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983), and award a new trial.

This Court recently stated: "The distinction between a weapon which is deadly or dangerous per se and one which may or may not be deadly or dangerous depending upon the circumstances is not one that lends itself to mechanical definition." *State v. Torain*, 316 N.C. 111, 121, 340 S.E. 2d 465, 471 (1986). It noted that the evidence in each case determines whether a weapon is properly characterized as lethal as a matter of law or whether its nature and manner of use merely raise a factual issue about its potential for producing death. *Id.* (quoting *State v. Sturdivant*, 304 N.C. 293, 301, 283 S.E. 2d 719, 726 (1981)).

The evidence as to the nature and manner of use of the weapon employed here came entirely from the victim. She testified only that the knife "was a black-handled silver blade, looked like a switch blade." She was unable to state the length of the blade, but she illustrated it to the jury by holding her hands apart. The record does not indicate the length thus shown, nor was the knife itself introduced into evidence. The victim testified that defendant had the knife in his hand throughout the incident and that he held it against her shoulder during the sexual union.

Conceding, without deciding, that this evidence did not establish the deadly nature of the knife as a matter of law, we nevertheless hold that the instruction did not rise to the level of "plain error." "In deciding whether a defect in the jury instruction constitutes 'plain error,' the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt." *State v. Odom*, 307 N.C. at 661, 300 S.E. 2d at 378. "[E]ven when the 'plain error' rule

is applied, '[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.'" *Id.* at 660-61, 300 S.E. 2d at 378.

To convict defendant of rape in the first degree, the jury had to find that he engaged in vaginal intercourse with the victim by force and against her will while he "[e]mploy[ed] or display[ed] a dangerous or deadly weapon or an article which the [victim] reasonably believe[d] to be a dangerous or deadly weapon." N.C.G.S. 14-27.2(a)(2)(a) (1986). In light of the record as a whole, especially the evidence as to the extreme traumatization of the victim, we believe the jury, had it been left to determine the nature of the weapon as a factual issue, would have found that the knife was a dangerous or deadly weapon or at least that the victim reasonably believed it to be such. This thus is not the "rare case" where the instructional error, if any, had a probable impact on the jury's finding of guilt so as to merit a new trial despite failure to object.

No error.