STATE OF NORTH CAROLINA v. ROBERT PERNELL MARTIN

No. 469A86

(Filed 5 May 1988)

1. **Searches and Seizures § 17— rape and burglary—tennis shoes found in defendant's bedroom—properly admitted**

The trial court did not err in a prosecution for two rapes, sexual offenses, and burglaries by admitting into evidence tennis shoes found in defendant's bedroom where the court found that a detective followed tennis shoe tracks from the house of one victim to the home of Hattie Tart; Ms. Tart told the detective that she was the owner of the house and that she paid rent on it; Ms. Tart in fact paid rent on the house; defendant "may contribute along with Sherry Gore to some of the light bill and food"; Ms. Tart gave the detective permission to enter the house and pointed out defendant's bedroom; the detective knocked on the bedroom door, which was voluntarily opened by defendant; the detective engaged defendant in conversation and stepped into the room without objection from defendant; and the detective then saw the tennis shoes. The evidence clearly supports the finding that Ms. Tart paid the rent

State v. Martin

on the house and had the authority over the premises to allow the detective to enter, and the detective was in a place where he had a right to be and could lawfully seize evidence which was in plain view.

**2. Searches and Seizures § 3; Prisons § 2— pretrial detainee—search of cell—contents of notebook—admissible**

The district attorney could properly examine a defendant in a prosecution for two rapes, burglaries, and sexual offenses regarding a letter written by defendant to his brother asking the brother to commit perjury where the letter was in a notebook seized during a search of defendant's cell before trial. The same need to maintain order which restricts a person's constitutional rights while in prison applies to pretrial detainees, so that defendant did not have a reasonable expectation of privacy in a jail cell, and the jailer had a right to inspect anything he found in the cell, including defendant's notebook. Fourth Amendment to the U.S. Constitution.

**3. Criminal Law §§ 91.1, 102.5— cross-examination—erroneous transcript of first trial—objection and continuance denied**

The trial court did not err during defendant's second trial for two rapes, sexual offenses and burglaries by allowing the State to impeach him by asking questions based on the transcript of the first trial and not allowing a continuance because the transcript of the first trial was erroneous. Although the prosecuting attorney was present at the first trial, he was entitled to assume that the transcript was more accurate than his memory and, at the time, there was nothing before the court except the statement of the defense attorney that the transcript was incorrect.

**4. Criminal Law § 117— character evidence—jury not charged on evidence of good character—no error**

The trial court did not err in a prosecution for two burglaries, rapes and sexual offenses by not charging the jury as to evidence of his good character where defendant's character witness did not testify as to reputation or in the form of an opinion, and, even if defendant properly introduced evidence of good character, defendant did not submit his request for instructions in writing and did not preserve his exception. N.C.G.S. § 15A-1231.

**5. Criminal Law §§ 34.2, 34.4— character evidence—cross-examination—other acts of misconduct**

The trial court did not err in a prosecution for two rapes, sexual offenses, and burglaries by allowing the prosecutor to ask defendant's character witness whether he knew that defendant had been selling drugs in jail and, although the State should not have been allowed to ask whether the witness knew that defendant had been charged with selling drugs in jail, there was no prejudice because defendant had already testified that he had grown marijuana. N.C.G.S. § 8C-1, Rule 405(a). N.C.G.S. § 15A-1443(a).

**6. Criminal Law § 102.6— burglary and rape—closing argument—no gross prejudice**

The prosecutor's closing argument in a prosecution for two rapes, burglaries, and sexual offenses was not so grossly improper as to require the

trial court to intervene *ex mero motu* where the prosecuting attorney in effect told the jury the prosecuting witnesses were relying upon them to find the defendant guilty.

Justice MEYER concurring in the result.

Justices MITCHELL and WHICHARD join in this concurring opinion.

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) from life sentences imposed by *Clark, Judge,* at the 27 January 1986 Criminal Session of Superior Court, COLUMBUS County. This Court allowed defendant's motion to bypass the Court of Appeals in his appeal from sentences of less than life imprisonment. Heard in the Supreme Court 10 September 1987.

The defendant was charged with first degree rape, first degree sexual offense and first degree burglary for an occurrence on 5 May 1985. He was charged with the same crimes for an occurrence on 15 June 1985. All the cases were consolidated for trial. The defendant was first tried for these offenses at the 4 November 1985 Criminal Session of Superior Court, Columbus County. The jury was unable to reach a verdict and the case ended in a mistrial. The defendant was tried a second time at the 27 January 1986 Criminal Session.

A witness for the State testified that on 5 May 1985 during the nighttime, the defendant entered her house while she was asleep and raped her. She also testified he performed cunnilingus on her. He left her tied to her bed. A second witness for the State testified that on 15 June 1985 she was cleaning her house after 10:00 p.m. The defendant came into her house, tied her to the bed, raped her and performed cunnilingus on her.

Sterling Cartrette, a deputy sheriff, testified that early in the morning of 16 June 1985 he went to the home of the second victim. He found tennis shoe tracks which he followed to the home of Ms. Hattie Mae Tart. He found the defendant in a bedroom at Ms. Tart's house. He also found a pair of tennis shoes in the bedroom. A person who had been in a jail cell with the defendant testified the defendant told him he had raped a white woman, commenting that he tied her up and "ate the bitch."

The defendant testified that on the night of 15 June 1985 he had gone to check on his marijuana plants in the woods and had

crossed a bean field to get to the house in which he lived with his girlfriend and Ms. Tart. His girlfriend testified to an alibi for the defendant.

The jury found the defendant guilty of second degree rape, second degree sexual offense, and second degree burglary in the 5 May 1985 offenses. It found the defendant guilty of first degree rape, second degree sexual offense, and second degree burglary in the 15 June 1985 offenses. The defendant appealed from the imposition of prison sentences.

*Lacy H. Thornburg, Attorney General, by Reginald L. Watkins, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Geoffrey C. Mangum, Assistant Appellate Defender, for defendant appellant.*

WEBB, Justice.

We note at the outset that the defendant did not object or assign error to the consolidation of these cases for trial. We do not consider the question of whether this joinder was proper.

[1] The defendant first assigns error to the admission into evidence of his tennis shoes which were found in his bedroom in the house in which he was staying. The defendant objected to the admission of this evidence during the first trial and a voir dire hearing was held out of the presence of the jury. Sterling Cartrette testified that he was a detective with the Columbus County Sheriff's Department. In the early morning of 16 June 1985 he went to the rape victim's home and found footprints made by a person who was wearing tennis shoes. He followed the footprints until they led him to Ms. Hattie Tart's home. He knocked and Ms. Tart came to the door. Detective Cartrette testified that he asked Ms. Tart if there was a male there and she said, "yes." He testified Ms. Tart told him she was the owner of the house and gave him permission to enter. He testified further that Ms. Tart led him to the defendant's bedroom door which was closed. He knocked on the door and identified himself. A male voice asked what he wanted and Detective Cartrette said he wanted to talk to him. The door opened and he saw the defendant standing in his shorts. Detective Cartrette told the defendant a lady had been raped and he had followed the tracks from her house. Detective Cartrette

State v. Martin

stepped into the room and advised the defendant of his constitutional rights. At this time Detective Cartrette saw a pair of tennis shoes on the floor. The defendant told him he had worn the tennis shoes the previous night and Detective Cartrette took them. Detective Cartrette arrested the defendant at that time.

Hattie Tart testified for the defendant that Detective Cartrette came to the house in which she was living early in the morning of 16 June 1985. She was awakened by a knock on the door and when she answered it Detective Cartrette asked her if a man was in the house. When she answered in the affirmative, Detective Cartrette asked for the location of the man's room and she led Detective Cartrette to the room. Detective Cartrette knocked once and pushed open the door. She then heard Detective Cartrette tell the defendant to put his clothes on. She testified Detective Cartrette did not ask her whose house it was or who paid the rent until he questioned her again a few days later. She testified that Sherry Gore lived in the house with the defendant. Hattie Tart testified further that she paid the rent and Sherry Gore paid the light bill. Ms. Tart said the defendant paid part of the household expenses by giving money to Sherry. On cross-examination she said it was her house.

Following the voir dire hearing, the court found facts as follows: Detective Cartrette followed tennis shoe tracks from the home of a woman who told him she had been raped to the home of Hattie Tart. Ms. Tart told Detective Cartrette she was the owner of the house. She also told him she paid rent on it to the owner, Mr. Powell. She gave him permission to enter the house and pointed out to him the defendant's bedroom. The court found as facts that Detective Cartrette knocked on the defendant's bedroom door, which door was opened by the defendant. Detective Cartrette then engaged the defendant in conversation and saw the tennis shoes at that time. The court found that Hattie Tart pays the rent on the house and the defendant "may contribute along with the witness Sherry Gore to some of the light bill and food." The court found the search of the premises was done with the permission of the person in control of the house and ordered that the tennis shoes be admitted into evidence.

The defendant argues that the admission of the tennis shoes into evidence is a violation of his right to be free from an

unreasonable search or seizure as guaranteed in the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Sec. 20 of the Constitution of North Carolina. He contends (1) there was no consent given to search the house, (2) that if Ms. Tart gave consent she did not have the authority to authorize a search of the defendant's bedroom, and (3) the defendant's arrest was invalid so that the seizure of the shoes was not incident to a valid arrest.

The evidence clearly supports the finding of the court that Ms. Tart paid the rent on the house and had the authority over the premises to allow Detective Cartrette to enter. *State v. Barnett*, 307 N.C. 608, 300 S.E. 2d 340 (1983). The court also found that when Detective Cartrette knocked on the door of defendant's room the defendant voluntarily opened the door and engaged in a conversation with Detective Cartrette. During this conversation, Detective Cartrette stepped into the bedroom without any objection by the defendant. At this time he saw the tennis shoes. We hold Detective Cartrette was in a place where he had a right to be and he could lawfully seize evidence which was in plain view. *Coolidge v. New Hampshire*, 403 U.S. 443, 29 L.Ed. 2d 564 (1971); *State v. Bogin*, 66 N.C. App. 184, 310 S.E. 2d 640, *disc. rev. denied*, 310 N.C. 478, 312 S.E. 2d 886 (1984). The tennis shoes were properly admitted into evidence.

In light of our holding that the defendant consented to the entry into his bedroom, we do not determine whether he had such control over the bedroom that a consent was necessary. Nor do we pass on his contention that the seizure of the tennis shoes was the fruit of an illegal arrest.

[2] The defendant next contends it was error for the prosecuting attorney to be allowed to ask him on cross-examination whether he had written a letter to his brother, asking the brother to commit perjury at the trial. This question was based on a letter written by the defendant, which was seized during a search of the defendant's cell. In *Hudson v. Palmer*, 468 U.S. 517, 82 L.Ed. 2d 393 (1984), the United States Supreme Court held the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The defendant says that in *Hudson* the Court left open the question of whether a different result obtains in the case of pretrial detainees. It is true

that the Court in *Hudson* did not discuss the question of pretrial detainees. That question was not before it. The same considerations which the Court said restrict a person's constitutional rights while in prison, that is, the need to maintain order in places of confinement, apply to pretrial detainees who are confined in jails. In *Bell v. Wolfish*, 441 U.S. 520, 60 L.Ed. 2d 447 (1979), the Court dealt with the restrictions on pretrial detainees' Fourth Amendment rights without making any distinction between prisons and jails in which people are incarcerated awaiting trial. *See also State v. Primes*, 314 N.C. 202, 333 S.E. 2d 278 (1985). We hold the defendant did not have a reasonable expectation of privacy within his jail cell and the search was proper.

The defendant argues that even if the jailer had a right to search his cell, the search was unreasonable. The letter was discovered by going through the defendant's notebook. The defendant argues that this exceeded the lawful scope of the search. If the defendant had no expectation of privacy in his jail cell, we believe the jailer had the right to inspect anything he may have found in the cell. The jailer could have discovered something by reading the notebook that would have enabled him better to maintain order in the jail. We hold the defendant had no expectation of privacy in the jail cell and the search by the jailer was proper.

[3] The defendant next assigns error to the court's decision to allow the State to impeach him by asking questions based on the transcript of the first trial. At his second trial, the defendant testified that he left "Rojay's" at approximately 11:00 p.m. The prosecuting attorney asked the defendant on cross-examination if it were not true that he testified at his former trial that he did not leave until 1:00 a.m. The defendant objected on the ground that the transcript was not correct. He did not make any showing that the transcript was not correct other than the statement of his attorney and the court overruled the objection. After the presentation of evidence had been concluded, the defendant moved for a continuance in order to have time to show the transcript was not correct. This motion was denied. After the trial was complete the defendant filed an affidavit from the court reporter stating that the transcript was not correct. The court reporter further stated that he had been called by the defendant's attorney and was on his way to the trial when his automobile broke down.

State v. Martin

The defendant argues it was error to allow the prosecuting attorney to question him based on an erroneous transcript and it was error not to grant the continuance. The defendant contends the question was improper because it was not asked in good faith. He says this is so because the prosecuting attorney was present at the first trial and knew the transcript was not correct. In cross-examining a witness, questions must be asked in a good faith belief that the answers which the examiner wants to elicit are true. *State v. Fisher*, 318 N.C. 512, 350 S.E. 2d 334 (1986); *State v. Dawson*, 302 N.C. 581, 276 S.E. 2d 348 (1981). Although the prosecuting attorney was present at the first trial, we cannot hold he acted in bad faith by relying on the transcript. He could assume the transcript was more accurate than his memory.

Nor can we hold that the court committed error by denying the motion to continue. At the time the motion was made there was nothing before the court except the statement of defendant's attorney that the transcript was not correct. The court did not abuse its discretion by denying the motion to continue. *State v. Ford*, 314 N.C. 498, 334 S.E. 2d 765 (1985). This assignment of error is overruled.

[4] The defendant next contends it was error for the court not to charge the jury as to the evidence of his good character. Bishop E. W. Jones testified for the defendant that he had known the defendant for three to four years, that the defendant was a good worker, that he had never heard anything bad about the defendant, and that the defendant was nice and honest. During the charge conference the defendant's attorney orally requested that the court charge on the evidence of the defendant's good character and reputation. The court said, "And in the absence of a tendered instruction, sir, citing applicable authority in support of it, sir, I'm going to deny it, sir." The court did not instruct on the defendant's character evidence.

When a defendant testifies, as he did in this case, and also offers evidence of his good character, he is entitled to have the jury consider his character evidence both as bearing upon his credibility as a witness and as substantive evidence bearing directly upon the issue of his guilt or innocence. A court is not required to charge on this feature of the case, however, unless the defendant requests it. *State v. Hannah*, 316 N.C. 362, 341 S.E. 2d 514 (1986); *State v. Peek*, 313 N.C. 266, 328 S.E. 2d 249 (1985). Bishop Jones testified that he had never heard anything bad about the defend-

ant and that the defendant was honest. N.C.G.S. § 8C-1, Rule 405(a) provides that character evidence may be proved by testimony as to reputation or testimony in the form of an opinion. Bishop Jones did not testify as to reputation, nor did he testify in the form of an opinion. One might be able to infer that the defendant had a good reputation from Bishop Jones' testimony that he had not heard anything bad about the defendant. If Bishop Jones' relationship with the defendant was such that he would likely have heard the defendant's character discussed if it were bad, the fact that he had never heard anything bad discussed is evidence of good reputation. 1 Brandis on North Carolina Evidence § 110 (1982).

Even if the defendant properly introduced evidence of his good character, he has not preserved his exception. N.C.G.S. § 15A-1231 which provides for conferences on jury instructions says, "any party may tender written instructions." Superior and District Court Rules, Rule 21, which deals with jury instruction conferences, says, "If special instructions are desired, they should be submitted in writing to the trial judge at or before the jury instruction conference." The defendant in this case did not submit his request for instructions in writing. We hold it was not error for the court not to charge on this feature of the case.

[5] The defendant next contends it was error to allow certain questions of Bishop Jones when he was being cross-examined. During cross-examination the following colloquy occurred:

> Q. All right, sir. Now, you've stated you know the character and reputation of Mr. Martin. Did you know that he had been selling drugs in the jail?
>
> MR. C. WILLIAMSON: Objection.
>
> MR. G. WILLIAMSON: Objection. Move to strike.
>
> COURT: Overruled.
>
> Q. Did you know that he had been charged with selling drugs in the jail?
>
> MR. G. WILLIAMSON: Objection.
>
> A. I heard that he was charged, and I was surprised. That I asked the Sheriff if marijuana grow in the jail for him to sell it from there.

The defendant argues that this cross-examination was improper under N.C.G.S. § 8C-1, Rule 404, Rule 405(a), and Rule 608(a).

Rules 404 and 608 deal with proof of a person's character. They have been interpreted in regard to asking a defendant on cross-examination about specific instances of misconduct in *State v. Clemmons*, 319 N.C. 192, 353 S.E. 2d 209 (1987); *State v. Scott*, 318 N.C. 237, 347 S.E. 2d 414 (1986); and *State v. Morgan*, 315 N.C. 626, 340 S.E. 2d 84 (1986). We do not interpret Rule 404 or Rule 608 as to their application in this case. Rule 405(a) applies to the cross-examination of character witnesses. It provides in part:

> In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

Assuming, arguendo, that the defendant put on evidence of his good character by the testimony of Bishop Jones, we note that Rule 405(a) allows questions of a character witness on cross-examination concerning specific instances of conduct of the person whose character is in issue. This changes the rule in this state as it existed before the adoption of the Evidence Code. *See State v. Hunt*, 287 N.C. 360, 215 S.E. 2d 40 (1975); 1 Brandis on North Carolina Evidence § 115 (1982). Although a character witness may be cross-examined about specific instances of misconduct, the objection to the second question posed to the witness should have been sustained. In this question the witness was asked whether he knew the defendant had been charged with selling drugs in the jail. In *State v. Williams*, 279 N.C. 663, 185 S.E. 2d 174 (1971), we held that a defendant could not be asked on cross-examination whether he had been charged with a crime. This Court stated that an indictment's function is not to determine whether a person is guilty of a crime but, rather, is to show only that the State's evidence is sufficient to try the defendant. For this reason it may not be used to impeach a witness. The same considerations apply during the cross-examination of a character witness. The fact that the defendant had been charged with a crime does not show he is guilty of the crime. The objection to this question should have been sustained.

Although we hold that it was error to allow the question as to whether the character witness knew the defendant had been charged with selling marijuana, we also hold this was not prejudicial error. In order to show prejudicial error, an appellant must show there is a reasonable possibility that, had the error not been

State v. Martin

committed, a different result would have been reached at trial. *See State v. Billups*, 301 N.C. 607, 272 S.E. 2d 842 (1981); N.C.G.S. § 15A-1443(a) (1977). The defendant testified prior to calling the character witness that he had grown marijuana. Indeed, the reason he gave for his footprints being found near the home of one of the victims was that he was checking on his marijuana plants. We hold that there is not a reasonable possibility that the additional information that defendant had been charged with selling marijuana could have affected the outcome of the trial. This assignment of error is overruled.

[6] In his last assignment of error the defendant contends the court should have stopped the prosecuting attorney *ex mero motu* from making certain parts of the jury argument. The prosecuting attorney argued in part as follows:

> And it's appropriate in this case that when these ladies took the stand, when they passed you as jurors and told you their stories, they leaned this way, and they looked at you with their trusting eyes, and I hope you realize the responsibility that lies with you in this case, because you are their only hope. You are all that's left. They know Robert Martin raped them. And if you turn him loose, you will turn him loose knowing that he raped them. What on earth are they to do?
>
> . . . .
>
> They, by their plea, by their willingness to testify, by coming here in court this week have pleaded with you, "Fellow citizens, will you help me? Will you support me? I've been raped. Will you protect me? He did it. I know it. All of the evidence shows it. Will you help me?" They ask you that, and they will be awaiting your answer.
>
> If this man, in the face of all this evidence, can be acquitted, if after all you've heard you can keep from convicting this man, then we just as well shut down this courthouse and put a wreath on the door, because Justice is dead. Justice is dead. And God help us all.

The defendant contends that the prosecuting attorney argued that the jury was accountable to the prosecuting witnesses, vouched for their credibility, curried favor with the jury by suggesting the prosecuting witnesses personally approved of each juror as a fit person to serve, invited the jury to pay heed not to

the evidence but to the pleas for protection by the two women, and told the jury any verdict other than guilty would be a violation of their oath.

A jury's decision should be based on evidence presented at the trial and not upon any accountability to the witnesses, to the victim, to the community, or to society in general. A prosecuting attorney should not argue otherwise. *State v. Boyd*, 311 N.C. 408, 319 S.E. 2d 189 (1984), *cert. denied*, 471 U.S. 1030, 85 L.Ed. 2d 324 (1985); *State v. Scott*, 314 N.C. 309, 333 S.E. 2d 296 (1985); *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983); and *State v. Britt*, 288 N.C. 699, 220 S.E. 2d 283 (1975). A prosecuting attorney is allowed wide latitude in arguing to the jury and the argument must constitute gross impropriety before the trial judge should intervene *ex mero motu*. Tested by this standard, we hold the closing argument of the district attorney was not such as to require the court to intervene *ex mero motu*. The prosecuting attorney in effect told the jury the prosecuting witnesses were relying upon the jury to find the defendant guilty. It is not as easily inferred from this argument that the jury would be accountable to anyone if it found the defendant not guilty. The argument was not so improper as to require the judge to intervene *ex mero motu*. This assignment of error is overruled.

No error.

Justice MEYER concurring in result.

I concur in the majority's conclusion that there was no prejudicial error in defendant's trial. I cannot join in what I consider unwarranted speculation in the majority opinion.

The majority says: "One *might be able to infer* that the defendant had a good reputation from Bishop Jones' testimony that he had not heard anything bad about the defendant." (Emphasis added.) The majority simply states that if Bishop Jones' relationship with defendant was such that he would have heard if defendant's character were bad, then his never having heard it discussed is evidence of "good reputation." The majority repeats its speculation that "[e]ven if the defendant properly introduced evidence of his good character" (emphasis added) in this way, then it was not error because he failed to preserve it by not requesting the "good character" instruction in writing. The majority states

its speculation yet a third time when it "[a]ssum[es], arguendo, that the defendant put on evidence of his good character by the testimony of Bishop Jones."

Based on such speculation, the majority adopts, for the first time in this state, the rule that if a character witness' relationship with the defendant is such that he would likely have heard defendant's character (actually reputation) discussed if it were bad, the fact that he never heard it discussed is evidence of good reputation. *See* Brandis on North Carolina Evidence § 110 (1982). If this rule is to be adopted by this Court, it should be done in an appropriate case and not upon mere speculation about what the evidence might have shown.

I cannot join in such speculation, and I believe it is improper for the majority to do so. I find it particularly inappropriate in this case. Bishop E. W. Jones, who described his occupation as "Minister of Religion, and Contractor by trade," said that he had known the defendant for three or four years and that during the early part of 1985, he and defendant worked together on a job for another company. Bishop Jones testified that he went out to work on his own and that defendant came to work for him in May or June of 1985 (the first rape took place on 5 May 1985, and the second rape on 15 June 1985) and worked for him "a few weeks before this happened." Bishop Jones described the way in which he had known defendant as a "working relationship." The record is devoid of any indication that they shared any church or religious relationship or that they were friends or even that they lived in close proximity to one another. There is simply nothing in the record to show that Bishop Jones' relationship with defendant was such that he would likely have heard the defendant's character discussed if it were bad. Thus, the fact that he had never heard it discussed would be no evidence whatever of "good character."

I also take exception to another aspect of the majority opinion. It has long been the law of this state that a *defendant* may not be cross-examined as to whether he has been "charged" with a crime. The majority, without citation to authority, extends this rule to a *character witness* for the defendant, whose testimony of "good character" is limited, in effect, to his testimony that he has "never heard anything bad about" the defendant. In many such

cases, as here, the witness would readily admit hearing of charges having been filed against the defendant. In the unique situation where the defendant's "good character" is sought to be established by the fact that the witness has not heard anything bad about him, such testimony should be admissible because it simply goes to show the jury that the character witness was not being entirely truthful.

In this case, the first question of the district attorney was entirely proper:

> Q. All right, sir. Now, you've stated you know the character and reputation of Mr. Martin. Did you know that he *had been* selling drugs in the jail?

(Emphasis added.) Following objection by defense counsel, the district attorney repeated the question but, probably inadvertently, used the term "charged with":

> Q. Did you know that he *had been charged with* selling drugs in the jail?

(Emphasis added.) Even assuming that the change of words was intentional, it would not be error in the context of the circumstances here. The majority, though finding error, finds the error not to be prejudicial because other evidence of defendant's use and growing of marijuana was admitted. This is simply not a proper case in which to extend the rule against cross-examination of a defendant as to "charges" filed against him to a character witness whose testimony is limited to never having heard anything bad about the defendant.

The majority seems to adopt two major principles of the law of evidence, both new to this state, neither of which it finds to be prejudicial under the facts presented by this case. I consider the purported adoption of both pure dictum.

Justices MITCHELL and WHICHARD join in this concurring opinion.