2001 ME 163

**STATE of Maine**

v.

**Mathieu S. O'ROURKE.**

Supreme Judicial Court of Maine.

Argued: Sept. 14, 2001.
Decided: Nov. 29, 2001.

David W. Crook, District Attorney, Paul Rucha, Asst. Dist. Attorney (orally), James Mitchell, Asst. Dist. Attorney, Augusta, for State.

Gregg D. Bernstein, Lipman & Katz, P.A., Augusta, for defendant.

Panel: WATHEN, C.J.,* and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

* Wathen, C.J., sat at oral argument and participated in the initial conference but resigned

DANA, J.

[¶ 1] Mathieu O'Rourke appeals from the judgment of conviction entered in the Superior Court (Kennebec County, *Marden, J.*) following a jury verdict finding him guilty of solicitation to commit murder, 17–A M.R.S.A. § 153 (1983). O'Rourke contends that the court erred in denying his motions to suppress letters found in his jail locker, letters found at the residence of a witness, and statements made to an inmate informant and an undercover agent; in admitting taped conversations between himself, the informant, and the undercover agent; in allowing testimony concerning gang symbols and code in correspondence; in refusing to allow O'Rourke to cross-examine a federal agent about a prior investigation of the informant; in admitting the testimony of a man who transcribed letters for O'Rourke and the letters themselves; and in excluding his girlfriend's testimony about statements O'Rourke made to her while incarcerated. We affirm the judgment.

## I. BACKGROUND

[¶ 2] The facts are largely undisputed. In 1998, while O'Rourke was incarcerated at the Kennebec County Correctional Facility awaiting a trial for possession of a firearm and a decision on a motion to revoke his probation, he became friends with Ramon Davila, an inmate sometimes housed in his cell block. After Davila's release, the two corresponded. Some of the letters from O'Rourke are drafted wholly or partially in code. The letters refer to Davila "playing ball," and discuss in veiled terms a task Davila was to perform for O'Rourke.

[¶ 3] Also after Davila's release, O'Rourke got to know Anthony Dorothy,

before this opinion was adopted.

who was awaiting sentencing for a federal offense and was in the cell block when O'Rourke was placed there. Dorothy helped O'Rourke contact a "hit man" to kill a witness who would testify against O'Rourke, but the "hit man," unbeknownst to O'Rourke, was really Brent McSweyn, an undercover federal agent. O'Rourke participated in phone calls with the undercover agent, which the agent recorded. Based on information from Dorothy, the police obtained a warrant to search O'Rourke's person and his jail cell to find "letters and other evidence which may exist, which is evidence of the furtherance of the murder for hire scheme . . . ." In conducting the search, the police searched O'Rourke's jail locker, located away from his cell, where they discovered some letters. The same evening, the police searched Davila's residence pursuant to a separate warrant obtained to look for stolen property. They found letters from O'Rourke, but left them there until they obtained another warrant to seize the letters based on the information obtained from Dorothy and their earlier searches.

[¶ 4] The police interrogated Davila regarding the letters and Davila told the police that he had agreed to kill the witness for O'Rourke. Thereafter, O'Rourke sent Davila letters transcribed and mailed by a fellow inmate, Richard Marks, because O'Rourke no longer felt safe writing to Davila in his own name. In the letters, O'Rourke reprimanded Davila for talking to the police and threatened Davila and his family.

[¶ 5] The State indicted O'Rourke on one count of solicitation to commit murder. O'Rourke moved to suppress any evidence of his discussions with Dorothy and the undercover agent on the ground that the law enforcement techniques employed violate the Due Process Clause of article 1, sections 6 and 6–A of the Maine Constitution and the Fourteenth Amendment of the United States Constitution. He also moved to suppress the letters discovered in his locker and at Davila's residence as the products of an unlawful search. The court denied O'Rourke's motion to suppress.

[¶ 6] During the trial, the court allowed Davila to testify that symbols on letters he received from O'Rourke were gang related; the court permitted the testimony over O'Rourke's objections that Davila lacked personal knowledge and was not qualified as an expert on gang symbols.

[¶ 7] The witnesses at trial disagreed about the extent of Dorothy's role in eliciting O'Rourke's plans. Dorothy testified that O'Rourke approached him to see if he knew anybody who would commit a murder for hire. According to Dorothy, he responded only to tell O'Rourke he might know a person he could call and agent McSweyn instructed him not to encourage O'Rourke. McSweyn's testimony comported with Dorothy's; he testified that he only asked Dorothy to gather information and give O'Rourke the telephone number to call. By contrast, O'Rourke testified that Dorothy initiated contact and approached him every day about his plan to hire a person to murder the witness.

[¶ 8] During McSweyn's testimony, the court admitted tapes and transcripts of the telephone conversations between O'Rourke, Dorothy, and McSweyn. O'Rourke objected on the ground that the State failed to provide a foundation that O'Rourke's voice was on the tape. The court did not, however, permit O'Rourke to question agent Kenneth MacMaster about the details of an earlier investigation of a murder for hire case against Dorothy.

[¶ 9] After conducting voir dire of Jillian Bolduc, O'Rourke's girlfriend, the court sustained a hearsay objection to Bolduc's testimony that, during a jail visit,

O'Rourke told her he was afraid and nervous because Dorothy was harassing him. The court later admitted the testimony of Richard Marks, whom the State produced as a witness the week before trial. Marks testified that he transcribed letters for O'Rourke while they were in prison together and sent them out with his return address because O'Rourke did not believe it was safe to send mail to Davila at the time. The court admitted the letters over O'Rourke's objection that they were unfairly prejudicial.

[¶ 10] A jury convicted O'Rourke, after which O'Rourke moved for a new trial on the ground that the court had admitted the letters that Marks transcribed, which were irrelevant and unfairly prejudicial, over O'Rourke's objection. The court concluded that, although the letters were highly prejudicial, they were relevant as evidence of "whether the activities by [O'Rourke] were simply jail-house bravado or constituted a more serious effort to effectuate the crime of murder of a witness ...." O'Rourke appealed from the conviction.

## II. DISCUSSION

### A. The Conversations with McSweyn

■ [¶ 11] O'Rourke contends that the court erred in denying his motion to suppress evidence of his conversations with agent McSweyn because the information obtained from these conversations is "unreliable or obtained in a manner that is not just suspect, but [so] overwhelmingly underhanded and deceitful that its admission results in a deprivation of equity and fairness." O'Rourke contends that, because he was in custody, confined with Dorothy in jail under "the constant threat of physical danger," and the State exercised virtually complete control over his environment, the use of an informant to deliberately elicit or coerce statements from O'Rourke violates his due process rights.

■ [¶ 12] We will uphold a denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision. *State v. Thibodeau*, 2000 ME 52, ¶ 5, 747 A.2d 596, 598. We review any questions of law that arise in the analysis de novo. *Id.*

■ [¶ 13] A confession is involuntary and inadmissible if the interrogation methods employed were "so offensive to a civilized system of justice" that they violate the Due Process Clause. *Miller v. Fenton*, 474 U.S. 104, 109–10, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). The United States Supreme Court held that the use of an informant who visited a suspect in his hotel room did not violate the Due Process Clause. *Hoffa v. United States*, 385 U.S. 293, 310–12, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). That the Supreme Court held "the use of secret informers is not *per se* unconstitutional," *id.* at 311, 87 S.Ct. 408, does not mean, however, that the use of Dorothy in this case is necessarily constitutional. Rather, we must examine the facts to see if they constitute a due process violation.

[¶ 14] O'Rourke did not face the type of coercion that renders a confession involuntary. Dorothy was not placed in O'Rourke's cell block for the purpose of informing on him; rather, O'Rourke was moved into the cell block that Dorothy occupied before the authorities were aware of O'Rourke's scheme and before O'Rourke even spoke with Dorothy. Furthermore, McSweyn instructed Dorothy not to encourage O'Rourke's activities. We hold that, on the facts of this case, there is no due process violation. The court did not err in denying O'Rourke's motion to suppress.

### B. The Searches of the Jail Locker and Davila's Residence

■ [¶ 15] O'Rourke contends that the search of his jail locker "was a warrantless

and unreasonable search and the letters found in the locker should have been suppressed." He contends that he had an expectation of privacy in the locker and its contents. According to O'Rourke, this search differs from the random search of a convicted inmate's possessions for safety purposes. *See Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). O'Rourke contends that letters discovered in Davila's residence are inadmissible because the search of the home "was premised upon evidence illegally seized" from his jail locker. The State contends that O'Rourke lacked a reasonable expectation of privacy in the locker, so both the search of the locker and the subsequent search of Davila's apartment were legal.

■■■■ [¶ 16] "The fourth amendment to the United States Constitution and article I, section 5 of the Maine Constitution protect us from unreasonable intrusions of police officers and other government agents." *State v. Caron,* 534 A.2d 978, 979 (Me.1987). "[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (internal quotation marks omitted). The Court must, therefore answer two questions: (1) "whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy"; (2) "whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable." *Id.* (internal quotation marks omitted).

[¶ 17] The United States Supreme Court has held that random searches of prisoners' cells do not violate the Fourth Amendment because prisoners have no expecta-

tion of privacy in their cells and prison officials must be allowed to ensure the safety of the institution. *Hudson,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393. The Court reasoned that "imprisonment carries with it the circumscription or loss of many significant rights. These constraints on inmates, and in some cases the complete withdrawal of certain rights, are 'justified by the considerations underlying our penal system.'" *Id.* at 524, 104 S.Ct. 3194 (citing *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)) (quoting *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948), *overruled on other grounds by McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991)). The Court stated: "[S]ociety is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Id.* at 526, 104 S.Ct. 3194. Specifically, the Court noted that prison administrators must be free to take measures to ensure the safety of staff, personnel, and visitors to the prison, which would be impossible if prisoners had any expectation of privacy in their cells. *Id.* at 526–28, 104 S.Ct. 3194. Although the Court stated: "We hold that the Fourth Amendment has no applicability to a prison cell," *id.* at 536, 104 S.Ct. 3194, it remains unclear whether the holding is limited by the rationale of preserving institutional safety.

[¶ 18] Courts have split regarding whether searches conducted for reasons other than institutional safety violate the Fourth Amendment. The Second Circuit has held that the Supreme Court's rationale in *Hudson* applies only to searches for institutional purposes, not to searches initiated by prosecutors outside the prison

"solely to obtain information for a superseding indictment." *United States v. Cohen*, 796 F.2d 20, 23–24 (2d Cir.1986); *see also United States v. Santos*, 961 F.Supp. 71, 71–72 (S.D.N.Y.1997) (stating that, although prison officials catalogue an arrestee's belongings "to protect that property while it is in police custody, to protect the police from claims over lost or stolen property, and to protect the police from potential danger," it "may not conduct a search of an arrestee's property to discover inculpatory evidence under the guise of an inventory search"); *McCoy v. State*, 639 So.2d 163 (Fla.Ct.App.1st Dist. 1994) (following *Cohen* when a police officer, on direction of the assistant state attorney, searched the defendant's pretrial detention cell for writings containing incriminating statements on the eve of trial); *Lowe v. State*, 203 Ga.App. 277, 416 S.E.2d 750 (1992) (holding inmates have some Fourth Amendment protection "where no institutional need is served by the search").

[¶ 19] Some courts have concluded that the *Hudson* decision holds more broadly that inmates per se lack any Fourth Amendment privacy rights in their cells and lockers. *See United States v. Reece*, 797 F.Supp. 843, 846 (D.Colo.1992) (concluding that a prisoner has no expectation of privacy in his cell, and lacks Fourth Amendment protection against unreasonable search and seizure); *State v. Martin*, 322 N.C. 229, 367 S.E.2d 618, 621–22 (1988) (holding the defendant lacked any expectation of privacy in his cell, so the jailer had the right to inspect anything in his cell); *see also State v. Betterley*, 191 Wis.2d 407, 529 N.W.2d 216, 220–21 (1995) (holding that police do not need probable cause or a warrant to search

items that have already been searched for inventory purposes). Courts have also held that *Hudson*'s Fourth Amendment analysis applies to pretrial detainees as well as convicted prisoners. *See State v. Bolin*, 693 So.2d 583 (Fla.Ct.App.2d Dist. 1997) (holding, contrary to the second district's reasoning in *McCoy*, 639 So.2d 163, that pretrial detainees lack any expectation of privacy, so the Fourth Amendment does not protect them from cell searches); *People v. Phillips*, 219 Mich.App. 159, 555 N.W.2d 742 (1996) (holding that a pretrial detainee also lacks Fourth Amendment privacy protection because the institutional objectives remain the same).

[¶ 20] We conclude that O'Rourke lacked a reasonable expectation of privacy in his locker that would entitle him to Fourth Amendment protection against the search of the locker because prison officials examined and inventoried the contents of the locker when items were added or removed. That the State's motive in conducting the search differs from the state's motive in *Hudson* is irrelevant to the determination of whether the prisoner had a reasonable expectation of privacy in the area searched. The search of the locker did not violate the Fourth Amendment.

■ [¶ 21] Because the authorities legally searched O'Rourke's jail locker, O'Rourke cannot prevail on his contention that the search of Davila's residence resulted from information illegally obtained during an unlawful search. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (holding that evidence that would normally be admissible may be excluded if the evidence was a direct or indirect product of an unlawful search).[1]

---

1. In addition, the authorities searched Davila's apartment for stolen property, not for the letters, and O'Rourke lacked any expectation

of privacy in Davila's apartment. *See Steagald v. United States*, 451 U.S. 204, 219, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (stating that

C. Other Issues

[¶ 22] After considering O'Rourke's other contentions on appeal, we conclude that they are without merit.[2]

The entry is:

Judgment affirmed.

---

rights conferred by the Fourth Amendment are personal and "cannot bestow vicarious protection on those who do not have a reasonable expectation of privacy in the place to be searched").

2. Contrary to O'Rourke's contentions, he was not unfairly prejudiced by the admission of the letters that Marks transcribed, *State v. McEachern,* 431 A.2d 39, 43–44 (Me.1981) (stating that in general a court does not abuse its discretion by admitting evidence of threats against witnesses because "such activity constitutes admission by conduct"); the court did not err in limiting his questions to MacMaster about Dorothy's involvement in another murder for hire scheme MacMaster was investigating, which did not result in an indictment or conviction, *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) ("trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant"); the court did not err in allowing Davila to testify about the gang code and gang symbols used in their correspondence because a lay witness may express an opinion based on his knowledge that is helpful to a clear understanding of his testimony or the determination of a fact in issue, M.R. Evid. 701; Davila's and McSweyn's testimony adequately authenticated the taped recordings, M.R. Evid. 901(b)(4) (indicating that evidence may be authenticated by showing distinctive characteristics in conjunction with the circumstances); and the court did not err in excluding Bolduc's testimony regarding statements O'Rourke made about being afraid of Davila because the statement is hearsay and M.R. Evid. 803(3) only applies where the declarant's physical or mental state at the time the statement was made is relevant to an issue in the case. *See* Field & Murray, *Maine Evidence* § 803.3 (2000 ed.).

[*] Wathen, C.J., sat at oral argument and participated in the initial conference, but resigned before this opinion was adopted.