STATE OF NORTH CAROLINA v. JOSHUA PATRICK GRIFFIN, DEFENDANT

No. COA99-140

(Filed 15 February 2000)

### 1. Venue— State's motion to change—limitation of facilities

The trial court did not abuse its discretion in a first-degree murder prosecution by granting the State's motion to change the venue based upon the physical limitations of the facilities. Although the better practice would be to make findings of fact to support the order for a change, there was no abuse of discretion in light of the detailed statements by the trial court about the factors it was considering.

### 2. Homicide— first-degree murder—failure to instruct on second-degree

The trial court did not err in a first-degree murder prosecution by not giving an instruction on second-degree murder where the State offered evidence on each element of first-degree murder and there was no conflicting evidence.

### 3. Kidnapping— sufficiency of evidence

The trial court did not err by not dismissing a first-degree kidnapping prosecution where there was ample evidence from which the jury could infer that defendant, a law enforcement officer, stopped the victim for the purpose of a sexual encounter; "something" occurred; and defendant drove the victim from the well-traveled area where he had stopped her to a quiet, dark place so that he could ensure her silence by killing her and concealing her body.

**4. Homicide— first-degree murder—sufficiency of the evidence**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to dismiss where the State offered substantial evidence of each element of first-degree murder based on premeditation and deliberation.

**5. Criminal Law— curative instructions—timeliness**

Instructions to disregard testimony which were given the day after the testimony was given were not too late to prevent reversible error where the court was specific as to the content of the testimony, gave a curative instruction after discussing the contents of the curative instruction with the defendant, and received assurances from the jurors that they could obey the court's instructions. Moreover, even assuming error, there was no prejudice in light of the copious evidence offered by the State.

**6. Evidence— habit—others in defendant's position—relevance**

The trial court did not err in the prosecution of a police officer for first-degree murder by not allowing evidence that it was the habit of several officers to "run tags" and stop attractive women following the State's evidence that defendant had this habit. The State's evidence was relevant to showing that defendant had a habit with which he conformed on the morning of the crime and the fact that other officers engaged in the same activity is not relevant to any fact of consequence in the case. Moreover, there was other testimony that other officers engaged in this activity.

**7. Constitutional Law— state—unrecorded bench conferences**

Unrecorded bench conferences did not violate a first-degree murder defendant's right to be present at every stage of the trial where defense counsel moved for a "complete recordation," the court replied that bench conferences were not included, defense counsel answered in the affirmative, and the trial court directed defense counsel to inform defendant that the court should be advised and would address the issue if defendant wanted any of the discussions at the bench recorded. The record does not reflect any objection by defendant and defendant had constructive knowledge of all that transpired.

**8. Criminal Law— arraignment—day of trial**

There was no prejudice when a first-degree murder defendant was arraigned on the first day of trial after venue of the trial

had been moved from Union County, where formal arraignment had not been required because there were not more than 20 scheduled weeks of sessions for the trial of criminal cases. Where there is no doubt that a defendant is fully aware of the charge against him, or is in no way prejudiced by the omission of a formal arraignment, it is not reversible error for the trial court to fail to conduct a formal arraignment proceeding.

**9. Witnesses— statements—not disclosed**

The trial court did not abuse its discretion in a first-degree murder prosecution by not ordering the disclosure of witness statements after the witnesses testified or by failing to order the disclosure of notes used to refresh the recollection of witnesses.

**10. Grand Juries— review of members and witnesses—validity of indictment**

The trial court did not err in a first-degree murder prosecution by not conducting an in camera review of grand jury members and witnesses who appeared before the grand jury in order to determine the validity of the indictment.

Appeal by defendant from judgments entered 4 March 1998 by Judge William H. Helms in Rowan County Superior Court. Heard in the Court of Appeals 9 December 1999.

Joshua Patrick Griffin (defendant) was convicted of first-degree kidnapping and first-degree murder of Mrs. Kimberly Medlin (Mrs. Medlin) at the 12 January 1998 Session of Rowan County Superior Court. The charges against the defendant arose from the death of Mrs. Medlin on 29 March 1997.

The State offered evidence at trial tending to show that in the early morning hours of 29 March 1997, Mrs. Medlin left her place of employment in Charlotte and drove towards her home in Union County in her red Jeep Wrangler with black and white cowhide seat covers. Mrs. Medlin usually traveled home from work on Old Highway 74, also known as the Old Charlotte Road. Old Highway 74 and Rocky River Road intersect at Baker's Crossroad. On her way home, Mrs. Medlin spoke with her husband, Bridger Medlin, by cell phone on two occasions. On the second occasion, Mr. Medlin had arrived home and telephoned Mrs. Medlin at 2:45 a.m to ask about her location. Mrs. Medlin informed him that she was near Union Station about two miles from Baker's Crossroad. The State offered the business records of Bell Atlantic's Mobile System to confirm the time and

duration of the telephone calls. Mr. Medlin testified that he fell asleep, woke up and found that Mrs. Medlin was still not home. When he tried to call Mrs. Medlin on her cell phone at 3:59 a.m., her cell phone was answered by a police officer who informed Mr. Medlin that his wife was not at the scene.

Troy Brocato (Brocato) testified that he worked at a location off Old Highway 74 and that he prepared to leave work between 2:48 a.m. and 3:00 a.m. on 29 March 1997. As Brocato was about to turn onto the highway, he had to wait for a red "off road-type of Jeep like a Wrangler" traveling east. Brocato headed east as well and noticed a westbound vehicle make a "three-point turn" and head east behind the Jeep at a high rate of speed. Brocato further testified that the car following the Jeep had blue reflective tape on the rear, a whip antenna on the trunk, and lights on the roof. Brocato was not sure whether the car had "Police" on the trunk, but was sure he saw a "P" on the trunk. According to Brocato, the "police car activated its bubble gum lights" near the intersection of Teledyne Road and Old Highway 74. Both the Jeep and the police car continued through the green light at that intersection while Brocato made a right turn onto Rocky River Road.

David Smith, who lived diagonally across the street from the location where Mrs. Medlin's Jeep was found, testified that he was awakened by flashing lights. Upon looking out of his window, Smith saw a red Jeep and a police car parked behind it. Smith further testified that his digital clock read 3:22 a.m., but he kept that clock 15 to 20 minutes fast so that it was actually between 3:02 and 3:07 a.m.

Randy Baker testified that he drove his girlfriend home in the early morning hours of 29 March 1997. According to Mr. Baker, as he passed Shady Lane at "approximately 3:10, 3:15" while driving west on Old 74, he saw a "Wrangler Jeep" parked off the road on the other side of the road. The lights of the Jeep were on and no one was in or around the vehicle. When Mr. Baker returned some 20 to 25 minutes later, he passed the Jeep again, slowed down and noticed that no one was in or around the Jeep, but continued on his way.

Captain Simpson of the Monroe Public Safety Department (MPSD) testified he discovered Mrs. Medlin's Jeep at approximately 3:45 a.m. The Jeep was pointed east, its engine was running, the headlights were on and the driver's side window was open. Inside the Jeep lay a woman's handbag and beside the handbag was "a lady's billfold

and it was open." There was no sign of a struggle inside the Jeep and the only thing missing was Mrs. Medlin's driver's license.

On Sunday, 30 March 1997, at approximately 6:30 p.m., Mrs. Medlin's body was found at the end of Westwood Industrial Drive near the intersection of Rocky River Road. Her body was partially covered by a pallet, some roofing shingles and brush. The victim's bra was up above her breasts, her sweatshirt was inside out, pulled over her head and wrapped around her wrists or lower arms. An autopsy revealed abrasions on her knees consistent with her falling to the pavement, long scratches consistent with her body having been dragged, abrasions on the front of the neck, pinpoint hemorrhages in her eyes and a broken hyoid bone, all consistent with strangulation which could have been caused by a "heavy flashlight held against the neck" by a person standing behind her. Chemical testing in the Westwood Drive area revealed what appeared to be a trail of blood leading from the end of the road to the brush where the body was found.

The State also offered evidence that the impression of a heel print having the outline of chevron stripes was noted on the back of the victim's sweatshirt. The chevron stripes were similar to those found on the soles of shoes approved for use by officers of the MPSD. Testing by the SBI revealed that the print left on the victim's shirt was similar to one made by a size 8-½ shoe. The State offered evidence that size 8-½ Clarino shoes having chevron stripes on the sole were issued to the defendant on 5 December 1995 from the Monroe Family Shoe Center.

The Clarino shoes were not located at defendant's home. The State offered evidence that defendant told investigators that he had to throw the shoes away following an accident investigation, during which battery acid had gotten on the shoes. However, Officer Bradley, a witness for the State, testified that he assisted at the accident referred to by defendant, and recalled that defendant stated after the accident that his shoes were not damaged and he did not need new ones issued to him.

Other evidence tended to show that on the night of 28 March 1997, defendant worked at the Monroe Mall as a security officer. Upon finishing his shift, defendant went to the Monroe Police Department about 10:30 p.m., and talked to the dispatchers on duty. Defendant went to get ice cream for the officers, and then informed one of the dispatchers that he intended to go "harass some people."

At that time, defendant was being cross-trained as a police officer and a fireman. Defendant was not supposed to patrol during off-duty hours without the knowledge and permission of his supervisor. The State offered evidence tending to show that on the night of 28 March and during the early morning hours of 29 March 1997, the defendant was patrolling in Zone 5, which includes the Baker's Crossroad area.

Glenn Shelton testified that at about 1:00 a.m. on the morning of 29 March 1997, he saw a police car parked at Ron's Restaurant, which is located in Zone 5 near Baker's Crossroad. Shelton stopped to get money from an ATM and continued west on Old Highway 74. Shelton fell asleep at the wheel and drove his vehicle into a ditch. Shelton remembered seeing the police car parked at Ron's Restaurant and walked back to the restaurant, arriving there about 1:45 a.m. The police officer was still there and Shelton advised him of his situation. The police officer, identified at trial as defendant, told Shelton that he was off duty but would help him. Defendant and Shelton drove back to the location of Shelton's car. Defendant then used his cell phone, rather than his radio, to call a wrecker.

Lanny Tice testified that he received the dispatch call for a wrecker and arrived at the scene between 2:20 and 2:30 a.m. on the morning of 29 March 1997. Tice further testified that the police officer remained at the scene for some 15 minutes until Tice had pulled the car out of the ditch. The car was not driveable, however, and Tice loaded the disabled car onto his truck. Defendant left the scene while Tice was loading the car for transport.

The investigating officers testified that they interrogated defendant on several occasions during the investigation of Mrs. Medlin's murder; that defendant told them he arrived at his home at about 2:30 a.m. on the morning of 29 March 1997, after doing some off-duty patrolling; and that his brother and his brother's girlfriend were at home when he arrived there. Agent Burpeau testified that defendant's brother, Jeremy Griffin, told him that defendant arrived home about 2:48 a.m. and that he saw defendant vacuum his patrol car later the same morning.

Defendant further told investigators that he did not encounter Mrs. Medlin, did not see her Jeep, and had no recollection of having ever seen her before. However, Officer Bradley of the MPSD testified that defendant had on two separate occasions used his patrol radio to inform Bradley that a blonde "babe" driving a red Jeep with

black-and-white cowhide seat covers was passing through the area and that Officer Bradley should attempt to see her. On one of those occasions, Officer Bradley did take steps to observe the operator of the Jeep as she drove through the area. Bradley testified that the defendant told him that the driver was "hot" and he was going to "get her tag number."

The State offered further evidence tending to show that on numerous occasions defendant obtained information about attractive female drivers by using their license plate numbers ("running" their tags). Officer Bradley testified that defendant had on several occasions stopped attractive women by flashing his lights, even though the women had not committed any traffic violations. Two women testified at trial that defendant obtained information about them by running their license tags. One of the women testified that she encountered defendant at a party where he surprised her by knowing some personal information about her and defendant admitted that he obtained the information by running her tags when he saw her drive by one day.

On 4 April 1997, during the course of the investigation of Mrs. Medlin's murder, defendant was suspended. His patrol car was seized on 5 April 1997 for the purpose of laboratory testing. Officer Manus of the MPSD testified that defendant telephoned him on 5 April 1997 to ask whether testing with a "blue light" could reveal blood on the floor or on the seat of his vehicle. Manus advised the defendant that such testing could be done, and defendant responded by saying, "show me a police officer that doesn't have blood in his car, and I'll show you a police officer that doesn't do anything." On the following day, 6 April 1997, defendant asked Officer Manus to meet him at a bowling alley and Manus did so. Officer Manus testified that the defendant told him he was at Ron's Restaurant when he saw Mrs. Medlin's Jeep travel through the intersection, that the Jeep was weaving, and that he followed it. Manus further testified that defendant told him that he stopped Mrs. Medlin at the location where her Jeep was found; that she did not have a driver's license with her; that defendant asked Mrs. Medlin to sit in his patrol car because he suspected she was driving while impaired; that Mrs. Medlin became upset; that defendant determined she had not been drinking, and told Mrs. Medlin to wait in her Jeep until she was calm and then proceed. Defendant told Officer Manus that he then went directly home. During the conversation with Manus, defendant allegedly also told him that he was on Westwood Industrial Drive earlier that same day,

that he had to urinate, and that he might have left a "cover like you keep tools in" out there. Officer Manus testified that he reported the conversation with defendant to the Chief of Police.

Defendant offered alibi evidence through his brother Jeremy, and Jeremy's girlfriend, Holly Polk. Both defendant's brother and Ms. Polk testified that defendant got home before 3:00 a.m. on the morning of Mrs. Medlin's murder. Jeremy Griffin testified that his bedroom clock read "2:52 or 2:53" when defendant arrived home, and that the bedroom clock was "10 or 15 minutes fast." Jeremy Griffin denied that he told SBI Agent Burpeau that defendant arrived home at 2:48 a.m. He further denied that he told Agent Burpeau that he saw the defendant vacuuming the interior of his patrol car later that same morning.

Defendant offered evidence from Amanda Bartley who testified that she drove through Baker's Crossroad about 2:15 a.m. on 29 March 1997, and saw a police car there with its lights on. Nathan Hargett testified that he discovered a suspicious vehicle, a black Chrysler with Texas license plates, parked behind Ron's Restaurant, and that he saw a "light-headed" person who appeared to be a woman in the backseat of the car. Joshua Fraley testified that he and two other teenagers were walking through the area about 3:15 a.m. on 29 March 1997, and observed a red Jeep parked on the side of the road with the engine running. Fraley further testified that he heard two people arguing in the Jeep.

Defendant also offered evidence through friends and family members that he had no bruises, abrasions or scratches on his body on the day following the murder. Defendant's mother gave testimony corroborating defendant's claim that he had thrown away his Clarino shoes after getting battery acid on them. Defendant offered evidence that other officers patrolled off duty without obtaining permission from their superiors.

Laboratory tests on defendant's patrol car did not produce evidence that Mrs. Medlin had been in the car, nor did they reveal the presence of blood in defendant's patrol vehicle. Laboratory tests on defendant's uniforms did not reveal any hair or fiber transfer from Mrs. Medlin or her vehicle.

After deliberation, the jury returned verdicts of guilty of first-degree kidnapping and first-degree murder on the basis of both malice, premeditation and deliberation, and under the felony murder

rule. After deliberating punishment, finding both aggravating and mitigating circumstances, the jury recommended that defendant be sentenced to life imprisonment without parole. The trial court entered judgments based on the jury verdicts sentencing defendant to life imprisonment without parole on the charge of first-degree murder and to a minimum term of 73 months and a maximum term of 97 months on the charge of first-degree kidnapping. Defendant appealed from the judgments of the trial court.

*Attorney General Michael F. Easley, by Assistant Attorney General John G. Barnwell, for the State.*

*Law Office of Harold J. Bender, by Kevin L. Barnett, for defendant appellant.*

HORTON, Judge.

I.

[1] Defendant first assigns error to the trial court's grant of the State's motion to change the venue of this case from Union County. The State's motion was based on the physical limitations of the Union County facilities and the desire to begin the trial on 12 January 1998, the trial date set by the trial court. Defendant contends that the defendant had a right to be tried "in the place of the crime" and the citizens of Union County had a right "to see justice done in their own community." *State v. Chandler*, 324 N.C. 172, 184, 376 S.E.2d 728, 736 (1989). Our Supreme Court pointed out in *Chandler*, however, that while those are important and legitimate considerations, they are not the test for determining whether the trial court should transfer venue of a case. *Id.; see also State v. Jerrett*, 309 N.C. 239, 254, 307 S.E.2d 339, 347 (1983). "[A] motion for a change of venue is addressed to the sound discretion of the trial judge and will not be disturbed on appeal in the absence of a showing of an abuse of discretion." *State v. Barfield*, 298 N.C. 306, 320, 259 S.E.2d 510, 524 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980).

In *Barfield*, a case in which the State sought the death penalty, the trial court moved the case from Robeson County to Scotland County on motion of the defendant. Later, the district attorney moved that the case be transferred from Scotland County to Bladen County, because of the large number of persons awaiting trial in Scotland County, and because Scotland County had limited court sessions

available. Defendant Barfield objected to the transfer, arguing that N.C. Gen. Stat. § 15A-957 provided for a change of venue *on the motion of the defendant* and that the trial court is limited to ordering a transfer to another county in the same judicial (now, prosecutorial) district, or a county in an adjoining judicial district.

Our Supreme Court held in *Barfield* that, although the *statutory power* of the trial court to change venue is limited by the provisions of N.C. Gen. Stat. § 15A-957, the superior court has the inherent authority to order a change of venue in the interests of justice. *Barfield*, 298 N.C. at 320, 259 S.E.2d at 524; *English v. Brigman*, 227 N.C. 260, 41 S.E.2d 732 (1947). The Supreme Court found no evidence of an abuse of discretion in the transfer of the *Barfield* trial to Bladen County and noted that the trial court "had to consider the rights of the twenty other defendants awaiting trial in Scotland County as well as the rights of the defendant [Barfield]." *Barfield*, 298 N.C. at 321, 259 S.E.2d at 525.

In the case before us, the State moved for a change of venue in August 1997. The first hearing on the motion was continued on request of the defendant in order to prepare for the hearing. The trial court advised the parties at the time the hearing on the motion was continued that

> in the meantime I'm going to be checking with the Clerks and the Sheriffs in each county in this Prosecutorial District to see about the case load and the facilities and that sort of thing. I just want you to be aware of the fact that I'm going to make inquiry on my own in those four counties.

The District Attorney stated that the State had no objection to such inquiry by the trial court and counsel for defendant pointed out that the statute permitted the court to consider an adjoining county, and that Mecklenburg County was an adjoining county. The trial court then stated that "[w]e'll check with [Mecklenburg County] too to see what the status is." The trial court informed the parties that it was going to set the case for trial on 12 January 1998, and intended to try the case on that date because it was necessary to deny bail in the case.

On 16 September 1997, the State argued its motion for change of venue based on the pending caseload in Union County, including nine pending murder cases. The State used caseload figures from the Administrative Office of the Courts to show the caseload in each of

the counties in the district, and argued that the case should be moved to Stanly County. The State also pointed out the lack of a holding cell in the Union County Courthouse, no meeting rooms for lawyers, and no place for the jury to congregate except in the stairwells.

Defendant argued that the State was afraid "the good folks of Union County might render a fair and impartial verdict in [the] case," and that the case should not be moved from Union County. Defendant further argued that, if the trial court were inclined to move the case from Union County, it should be moved to Mecklenburg County, rather than to Stanly County. Upon inquiry by the trial court, defense counsel stated that, if the case were going to be moved, defendant did not object to Mecklenburg, Cabarrus, or Rowan Counties. The trial court stated that:

> In the event that it is moved outside of the district, if I decide to move it, I'll attempt to make sure that it's not at such a distance that it would inconvenience the family from either side as far as driving distance and that sort of thing. So I'll check with the people in Mecklenburg County. I'm going to check the figures over here. I'm going to check all of this argument that the District Attorney has made as far as numbers.

The trial court continued to discuss the matter with counsel stating that "there's a facility's [*sic*] problem throughout the district and the growing caseload creates a problem with case management, so that's one thing I'm going to take into consideration, among some other factors." The trial court further stated:

> This case is going to take longer than any case we've had in recent memory anywhere in the district other than the one that may have concluded today in Richmond County, which took about eight weeks—nine weeks. . . . [I]t's probably going to be a protracted sort of jury selection process, simply because of the alleged facts of the case and the apparent extensive family connection on both sides and law enforcement overtones in the case. So I'm going to take all of these factors into consideration and I'll let you know of my decision. But I'm interested in the case being tried as expediently as possible and in a place that's fair to both sides and in a place that's not unduly burdensome to anyone that has to participate in the trial or that chooses to observe it. So I'm going to take all of those factors into consideration before I make a ruling.

The trial court then took the motion for change of venue under consideration. At a subsequent motions hearing on 20 November 1997, the trial court asked if either the State or defendant wanted to be heard further on the motion for change of venue. Neither side wished to be heard. The trial court then ordered the case transferred to Rowan County without stating its reasons. Although we find no requirement that the trial court make findings of fact in support of its order for change of venue, we believe that would be the better practice. Yet, in light of the detailed statements by the trial court in the record about the factors it was considering in determining the State's request for change of venue, we conclude that the court did not abuse its discretion in ordering the change of venue to Rowan County. Defendant's first assignment of error is overruled.

II.

[2] Defendant assigns error to the trial court's failure to give a jury instruction on second-degree murder. Our Supreme Court has disavowed the rule that "the trial court is required to instruct on second degree murder in all first degree murder cases in which the State relies on the elements of premeditation and deliberation." *State v. Hickey*, 317 N.C. 457, 470, 346 S.E.2d 646, 655 (1986), (citing *State v. Strickland*, 307 N.C. 274, 290-91, 298 S.E.2d 645, 656 (1983) (overruled on other grounds)). So long as the evidence introduced by the State is "positive as to each and every element of the crime charged and there is no conflicting evidence relating to any element of the crime charged" the court is not required to give a second-degree instruction. *Strickland*, 307 N.C. at 283, 298 S.E.2d at 652.

"First degree murder is the unlawful killing of a human being with malice, premeditation, and deliberation." *State v. Misenheimer*, 304 N.C. 108, 113, 282 S.E.2d 791, 795 (1981). Premeditation and deliberation are mental processes that are difficult to prove and are usually established by circumstantial evidence. *State v. Sierra*, 335 N.C. 753, 758, 440 S.E.2d 791, 794 (1994). "To determine if a crime was with premeditation and deliberation, there must be evidence that a defendant thought about the act for some length of time, however short, before the actual killing; no particular amount of time is necessary to illustrate that there was premeditation." *Id.* Deliberation is a "fixed design to kill notwithstanding defendant was angry or in an emotional state at the time." *State v. Ruof*, 296 N.C. 623, 636, 252 S.E.2d 720, 728 (1979). Further evidence from which premeditation and deliberation might be inferred is the conduct of the defendant

STATE v. GRIFFIN

[136 N.C. App. 531 (2000)]

following the killing and the brutal manner in which the killing was done. *Sierra*, 335 N.C. at 758, 440 S.E.2d at 794.

In this case the State produced circumstantial evidence tending to show that defendant stopped Mrs. Medlin, placed her in his squad car, perhaps with the intent of making some sexual advance, "something" happened and he drove her to the location where her body was found some 36 hours later. The evidence tended to show that Mrs. Medlin died of strangulation, that her neck was broken, her skull was fractured at its base, her killer broke the hyoid bone in her neck, and there were pinpoint hemorrhages in her eyes. Her killer attempted to conceal her body by placing it under a pallet, some shingles and brush.

Thus, the State offered evidence on each element of first-degree murder. Although defendant argues that a jury could find that he panicked, killed Mrs. Medlin without premeditation or deliberation, and concealed her body while still in a panicked state, defendant presented no evidence in support of that theory. Defendant's evidence was focused on establishing an alibi and creating a reasonable doubt that he killed Mrs. Medlin. There was simply no conflicting evidence from defendant or any other witness to indicate that defendant did not commit premeditated murder. As the evidence raised no "material question as to the existence of premeditation [or] deliberation," there was no conflicting evidence which would have required a charge on second-degree murder. *State v. Brown*, 339 N.C. 426, 439, 451 S.E.2d 181, 189 (1994), *cert. denied*, 516 U.S. 825, 133 L. Ed. 2d 46 (1995).

Defendant's reliance on the decision of our Supreme Court in *State v. Camacho*, 337 N.C. 224, 446 S.E.2d 8 (1994), is misplaced. In *Camacho*, the defendant never denied killing his girlfriend, but the evidence was in conflict as to whether defendant committed the crime by lying in wait. Because of the conflict in the evidence, the Supreme Court held that the trial court should have instructed the jury on the lesser offenses of second-degree murder and voluntary manslaughter, both of which were supported by evidence other than evidence of lying in wait. *Id.* at 232, 446 S.E.2d at 12. Here, defendant denied that he killed Mrs. Medlin, and his evidence raised no conflict in the evidence as did the defendant's testimony in *Camacho*. The jury was properly instructed in this case, and this assignment of error is overruled.

III.

**[3]** Defendant next assigns error to the trial court's failure to dismiss the kidnapping charge at the close of State's evidence and at the close of all evidence. Defendant's motion to dismiss at the close of the State's evidence is waived because he introduced evidence. N.C.R. App. P. 10(b)(3). *State v. Elliott*, 69 N.C. App. 89, 100, 316 S.E.2d 632, 640, *appeal dismissed and disc. review denied*, 311 N.C. 765, 321 S.E.2d 148 (1984). Therefore we address only defendant's motion to dismiss the kidnapping charge made at the close of all of the evidence.

Review of a motion to dismiss requires that

[a]ll of the evidence, whether competent or incompetent, must be considered in the light most favorable to the state, and the state is entitled to every reasonable inference therefrom. Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal. In considering a motion to dismiss, it is the duty of the court to ascertain whether there is substantial evidence of each essential element of the offense charged.

*State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980) (citations omitted). In order to withstand a motion to dismiss, the evidence, whether direct, circumstantial, or both must be sufficient to draw a "reasonable inference of defendant's guilt." *State v. Barnes*, 334 N.C. 67, 75-76, 430 S.E.2d 914, 919 (1993). Once the court makes that determination it is up to the jury to decide whether " 'the facts *taken singly or in combination*, satisfy [it] beyond a reasonable doubt that the defendant is actually guilty.' " *Id.* (citation omitted). Our statutes provide that

any person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person . . . for the purpose of:

* * * *

(2)  facilitating the commission of a felony . . .

is guilty of kidnapping. N.C. Gen. Stat. § 14-39(a)(2) (1999). First-degree kidnapping, punishable as a Class C felony, requires a finding that the victim was either "not released . . . in a safe place or had been seriously injured or sexually assaulted." N.C. Gen. Stat. § 14-39(b) (1999).

STATE v. GRIFFIN

[136 N.C. App. 531 (2000)]

The State offered evidence in this case tending to show that prior to the morning on which Mrs. Medlin was killed, defendant had called another officer's attention to the "babe" in the red Jeep, and defendant had stated that he was going to get her license tag number; that defendant frequently engaged in the practice of "running" the license tag numbers of attractive females to obtain personal information about them; that in the early morning hours of 29 March 1997 defendant encountered Mrs. Medlin on the road, stopped her and removed her from her Jeep into his squad car; that "something" transpired in the squad car; that the concealed body of Mrs. Medlin was later discovered a few miles from where her Jeep had been stopped; that on the back of the sweatshirt Mrs. Medlin was wearing, there was a shoe print of the same size and type usually worn by defendant; that defendant initially denied that he had seen, stopped, or even knew, Mrs. Medlin, but later admitted that he had stopped her on the morning in question and put her in his patrol vehicle; that Mrs. Medlin's Jeep was discovered at the location where she was stopped by defendant with its lights on, its engine running, and the victim's purse on the seat; that only Mrs. Medlin's driver's license was missing. There was ample evidence from which the jury could reasonably infer that the defendant stopped Mrs. Medlin for the purpose of a sexual encounter, that "something" occurred and that defendant drove Mrs. Medlin from the much-traveled area where he had stopped her to a quiet, dark place so that he could ensure her future silence by killing her and concealing her body.

Defendant contends, however, that the evidence was not sufficient as a matter of law to support a finding of guilt as to first-degree kidnapping. While we agree with defendant that he may not be convicted on evidence which merely raises a "suspicion or conjecture," we hold that the State introduced substantial evidence of each element of the crime charged. The cases cited by defendant are distinguishable because they involved factual situations in which there was no evidence that the defendant in those cases had formed an intent to commit a felony *before* the victim was removed to another location. *See State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

In *Jackson*, the defendant asked the victim for a ride to town to obtain jumper cables, but actually had the intention of robbing the victim. The victim was later found dead in his car. Our Supreme Court held that defendant Jackson's conviction for first-degree kidnapping could not stand, since it was a reasonable inference that the victim drove to the place where he was shot, and defendant Jackson there

revealed for the first time his intent to rob the victim. "By this account of events, defendant would have restrained [the victim] for the first time only after the car had stopped . . . [and] such restraint would have been an inherent, inevitable feature of the armed robbery, and thus judgment for kidnapping could not be entered based on this restraint." *Jackson*, 309 N.C. at 41, 305 S.E.2d at 714.

Here, the evidence tends to show that defendant caused Mrs. Medlin to get into his patrol car where, according to defendant's statement to Officer Manus, she became very upset; and that defendant transported her to another location, killed her and concealed her body. A jury could reasonably infer that defendant did not kill Mrs. Medlin while sitting in his patrol car in a well-traveled lighted area, with the victim's car only a short distance away, its lights on and motor running. Further, there was no evidence that a struggle took place in defendant's patrol car, nor did scientific tests reveal the presence of blood in the patrol car. There being substantial evidence from which the jury could find every element of first-degree kidnapping, defendant's assignment of error is overruled.

IV.

[4] Defendant next assigns error to the trial court's failure to grant his motion to dismiss the charge of first-degree murder at the close of the State's evidence and at the close of all evidence. Again, defendant waived his motion at the close of the State's case by offering evidence. N.C.R. App. P. 10(b)(3). We have previously summarized the evidence tending to show that defendant murdered Mrs. Medlin with premeditation and deliberation in section II. above. For the reasons stated therein, we hold that the State offered substantial evidence of each element of the crime of murder in the first degree based on premeditation and deliberation and that the trial court did not err by denying defendant's motion to dismiss the charge of first-degree murder.

V.

[5] Defendant argues that the trial court committed prejudicial error in allowing the jury to hear certain testimony offered by Agent Isley and thereafter instructing the jury to disregard Isley's testimony. The challenged testimony relates to events that occurred when Agent Isley went to defendant's home on 8 April 1997, in order to discuss the investigation into the death of Mrs. Medlin. Prior to 8 April 1997, defendant had been suspended from work, and his patrol vehicle had

been seized for the purpose of laboratory tests. Agent Isley testified that he and defendant were outside defendant's home when Isley related to defendant that

> investigators knew that he stopped Kim Medlin's Jeep. We —I informed Mr. Griffin that we also knew that Kim Medlin was inside his patrol car.
>
> I informed Mr. Griffin that we also knew that he was on Westwood Industrial Drive. I also informed Mr. Griffin that we knew that he left evidence at the crime scene that could tie him to Kim Medlin's injuries.
>
> * * * *
>
> While I was speaking with Mr. Griffin and informing him of his association with Kim Medlin, he stood with both hands in his pockets and shaking his head up and down.
>
> * * * *
>
> Mr. Griffin never denied or confirmed all of the information that I had just provided to him.

On the following day the trial judge instructed the jury to disregard the above testimony of Agent Isley relating to his visit with defendant on 8 April 1997. The court then inquired of the jurors whether they could follow his instruction and completely disregard that testimony. Each juror answered in the affirmative by raising his or her hand.

The State does not concede that the testimony of Agent Isley was inadmissible and argues that the testimony was properly received pursuant to N.C. Gen. Stat. § 8C-1, Rule 801(d). However, since the trial court decided to reverse its earlier decision to allow the testimony, we will assume for the purposes of argument that such evidence was not admissible, and will address the manner and timeliness with which the trial court dealt with its introduction.

The gist of defendant's argument is that the curative instruction came too late to prevent reversible error. We disagree. While we are aware that timeliness of curative instructions is a factor in deciding whether the instruction did in fact cure any error, *see State v. Hunt,* 287 N.C. 360, 215 S.E.2d 40 (1975), the crucial inquiry is into the "nature of the evidence and its probable influence upon the mind of

the jury in reaching a verdict" as well as the probable "difficulty in erasing it from the mind." *State v. Strickland*, 229 N.C. 201, 207, 49 S.E.2d 469, 473 (1948). We have, therefore, considered the passage of time before the trial court gave curative instructions, Agent Isley's testimony that defendant "never confirmed or denied" any of the allegations against him, the trial court's inquiry of the jury as to whether each member could heed the curative instructions and ignore the testimony of Agent Isley and the jury's affirmative answers to the questions asked by the trial court, and cannot say as a matter of law that the curative instruction was untimely or ineffective.

Our Supreme Court has held that "[o]rdinarily, when objectionable evidence is withdrawn, no error is committed." *State v. Thomas*, 350 N.C. 315, 358, 514 S.E.2d 486, 512, *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 388 (1999). However, defendant argues that the admission of evidence of his silence in the face of Isley's statements was "highly incriminating," was "tantamount to a confession," and therefore could not be cured by an instruction to the jury. Defendant cites *Hunt*, 287 N.C. 360, 215 S.E.2d 40, in support of his contention.

In *Hunt*, defendant was tried for (then capital) rape, armed robbery, and felonious assault. Defendant did not testify himself, but called a witness who testified to his good character and reputation. On cross-examination, the assistant solicitor asked defendant's character witness if the witness was aware of defendant's "police record," that the defendant had "served time," and that defendant was on probation for possession of marijuana and assault. Over objection, the trial court allowed the character witness to answer that he did not know those things about defendant, and would not have been able to say that defendant had a good reputation if he had known those things about him. The following morning, defendant Hunt moved for a mistrial; the trial court denied the motion but gave the following instructions to the jury:

"THE COURT: Members of the jury, the witness, Richard Vaughan, the last witness who testified for the defendant, and testified as to the general character and reputation of the defendant, was asked a number of questions on cross examination by the Solicitor. The first question asked on cross-examination was: Mr. Vaughan, you say you have known him for a long time. Answer: Yes, sir. Members of the jury, there were a number of other questions asked by the Solicitor of the witness, Richard Vaughan, two of those questions under objection by defendant's counsel, and

the Court overruled the objection. I now reverse my ruling and sustain the objection, not only to those two questions, but I instruct you that you will not consider for any purpose the other questions propounded by the Solicitor. The Court instructs you that you will disregard each of these questions propounded by the Solicitor of the witness, Mr. Vaughan, and erase the matter from your minds. You will disabuse your minds of those questions on cross examination by the Solicitor of the witness, Richard Vaughan.

"Members of the jury, questions are not evidence. Questions by counsel or by the Solicitor are not evidence, they are simply questions. Evidence is the sworn testimony that comes from the lips of the witnesses on the stand."

*Id.* at 373-74, 215 S.E.2d at 49.

After discussing the general rules with regard to incompetent evidence and the effect of curative instructions, our Supreme Court held that the defendant in *Hunt* was entitled to a new trial because the "harmful effect of the evidence could not have been removed by the Court's instructions." *Id.* at 377, 215 S.E.2d at 50. In so ordering, the Supreme Court emphasized that

the instructions then given were not specific as to the content of the challenged questions, and by this time the evidence must have found secure lodgment in the minds of the jurors. The questions posed by the prosecutor were loaded with prejudice, and we are of the opinion that under the circumstances of this capital case, the harmful effect of the evidence could not have been removed by the Court's instructions.

*Id.* at 376-77, 215 S.E.2d at 50.

In the case before us, the trial court was specific as to the content of the testimony given by Agent Isley and gave a curative instruction after discussing the contents of the curative instruction with the defendant. Furthermore, unlike this case, there was no evidence in *Hunt* that the trial court inquired of the jury about their individual abilities to ignore the withdrawn testimony. Here, the trial court received assurances from the members of the jury that they could obey the trial court's instructions. *See State v. Adams*, 347 N.C. 48, 490 S.E.2d 220 (1997), *cert. denied*, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998). In *Adams*, our Supreme Court found no error where the trial court withdrew certain testimony, instructed the jury not to consider

the testimony, and the jury indicated in response to questions asked by the trial court that they would comply with the trial court's directives. *Id.* at 68, 490 S.E.2d at 230-31. Moreover, even assuming that the trial court committed error in admitting Agent Isley's testimony and in failing to withdraw it until the following day, we cannot say, in light of the copious circumstantial evidence offered by the State linking defendant to Mrs. Medlin's murder, that such an error was so prejudicial as to require a new trial. Defendant's fifth assignment of error is overruled.

## VI.

[6] Defendant next assigns error to the trial court's failure to allow his evidence that it was the habit and custom of several MPSD officers to "run tags" and stop attractive women following the State's evidence that defendant had this habit. The gravamen of defendant's argument is that the State's evidence, introduced pursuant to N.C. Gen. Stat. § 8C-1, Rule 406, opened the door for evidence showing the practice was common in the MPSD. We disagree.

The admissibility of evidence is governed by a threshold inquiry into its relevance. N.C. Gen. Stat. § 8C-1, Rules 401-403 (1999). In order to be relevant, the evidence must have a "logical tendency to prove any fact that is of consequence" in the case being litigated. *State v. Wallace*, 104 N.C. App. 498, 502, 410 S.E.2d 226, 228 (1991), *dismissal allowed and disc. review denied*, 331 N.C. 290, 416 S.E.2d 398, *cert. denied*, 506 U.S. 915, 121 L. Ed. 2d 241 (1992). The evidence produced by the State was relevant to showing that defendant had a habit with which he conformed on the morning of 29 March 1997. That other officers engaged in the same activity is not relevant to any fact of consequence in this case for it does not weaken the inference that defendant acted in conformity with his own habit during the events then under investigation.

Moreover, in this case other officers testified that officers other than defendant engaged in the activity at issue. For example, Officer Bradley testified on cross-examination that it was "not unusual" for MPSD officers to run the tags of attractive women and the officers would talk on their radios about women they had seen. Therefore, even assuming for the purposes of argument that the additional evidence should have been allowed, no prejudice could have resulted because "substantially the same testimony" was later admitted. *State v. Hageman*, 307 N.C. 1, 23-24, 296 S.E.2d 433, 446 (1982). Thus, this assignment of error is likewise overruled.

STATE v. GRIFFIN

[136 N.C. App. 531 (2000)]

## VII.

**[7]** Next, defendant assigns error to the numerous unrecorded bench conferences held during the trial of this case. Defendant alleges that his constitutional right to be present at every stage of trial was violated due to the number of these conferences. This assignment of error is without merit.

> It is the presence of defendant's counsel at a bench conference which ensures that the subject matter of the conference is not concealed from defendant. As we have said in such cases, defendant was "in a position to observe the context of the conferences and to inquire of his attorneys as to the nature and substance of each one" such that he could have taken appropriate exception.

*State v. White*, 349 N.C. 535, 546, 508 S.E.2d 253, 261 (1998), *cert. denied*, 527 U.S. 1026, 144 L. Ed. 2d 779 (1999) (quoting *State v. Speller*, 345 N.C. 600, 605, 481 S.E.2d 284, 286 (1997)).

Prior to trial, defendant's counsel moved for a "complete recordation." The trial court replied, "[t]hat does not include bench conferences. Everybody understand that?" Defendant's counsel answered in the affirmative, and the trial court directed defense counsel to inform defendant that, if defendant desired any of the discussions at the bench to be recorded, the trial court should be advised and would address the matter of recordation at that time. Later, the trial court directly addressed the defendant and advised him of the procedure regarding bench conferences:

> THE COURT: Your attorneys will inform you of anything that takes place at the bench. Anytime you want to be present or want that recorded, let your attorneys know and I'll see that it is recorded. Do you understand?

> MR. GRIFFIN: Yes, sir.

The record does not reflect any objection at any time by defendant to the trial court's procedure regarding bench conferences, nor is there any allegation that the procedure amounted to plain error. Indeed, the record is replete with instances in which the trial court stated for the record the purpose of a bench conference and many other instances in which the purpose of the conference is apparent from the context. Thus, through his counsel, defendant had "constructive knowledge of all that transpired." *State v. Buchanan*, 330 N.C. 202, 223, 410 S.E.2d 832, 844 (1991). Therefore, this assignment of error is overruled.

## VIII.

**[8]** Next, defendant assigns error to his purported arraignment on the first day of the trial. The State concedes that defendant was not formally arraigned but argues that no prejudice resulted. We agree. The applicable statute requires that there be calendared arraignment in counties in which there are 20 or more weeks of criminal trial sessions. N.C. Gen. Stat. § 15A-943(a) (1999). In this case the prosecutor told the court that arraignment had not taken place in Union County because there were not more than 20 scheduled weeks of sessions for the trial of criminal cases. Therefore, formal arraignment in Union County was not required.

Arraignment is the procedure whereby the defendant is "formally apprised of the charges pending against him and directed to plead to them." *State v. Smith*, 300 N.C. 71, 73, 265 S.E.2d 164, 166 (1980). However, "[w]here there is no doubt that a defendant is fully aware of the charge against him, or is in no way prejudiced by the omission of a formal arraignment, it is not reversible error for the trial court to fail to conduct a formal arraignment proceeding." *Id.* In this case, defendant was present at a minimum of four hearings held prior to the commencement of the trial. At a motions hearing held 3 June 1997 defendant was asked by the trial court whether he understood that he was charged with first-degree murder and first-degree kidnapping. Defendant responded by saying, "Yes, sir." At a hearing on 28 July 1997, defendant was informed in open court that the State intended to try him for capital murder.

Furthermore, the trial itself was adversarial in nature without any indication that defendant was unaware of the charges against him. Defendant presented 34 witnesses in his own defense, and was ably represented by counsel. Finally, at the conclusion of pretrial motions on the first day of defendant's trial, the district attorney inquired of defendant, through counsel, whether he desired a formal arraignment, and defendant replied that he did not. Defendant has failed to show any prejudicial error resulting from the lack of a formal arraignment. This assignment of error is overruled.

## IX.

**[9]** Defendant next argues that the trial court erred in failing to order the disclosure of witness statements after the witnesses testified and by failing to order the disclosure of notes used to refresh the recollection of witnesses. N.C. Gen. Stat. § 15A-903(f) provides that a

defendant is entitled to statements that have been "signed or otherwise adopted or approved by" a witness who testifies as a witness for the State. N.C. Gen. Stat. § 15A-903(f)(5)(a) (1999). Upon careful review of the record and pertinent transcript sections, we find no error.

The trial court conducted a *voir dire* examination of Tammy Boylen and David Simpson, two of the witnesses whose alleged statements are at issue. After each examination, the trial court concluded that the witness had not signed or otherwise adopted the statements that were taken by investigating officers. Thus, defendant has not shown any prejudicial error regarding the statements allegedly made by those witnesses.

The request to view writings used by a witness to refresh his memory prior to testifying is addressed to the sound discretion of the trial judge. N.C. Gen. Stat. § 8C-1, Rule 612(a)(b) and its "Commentary"; *State v. Steele*, 86 N.C. App. 476, 478, 358 S.E.2d 98, 99, *disc. review denied*, 320 N.C. 797, 361 S.E.2d 86 (1987). Therefore, the decision of the trial court in this regard will not be disturbed absent a showing of abuse of discretion. Upon review of the record, we hold that the trial court did not abuse its discretion on these facts.

In one instance the trial judge examined the notes reviewed by Officer Bradley prior to testifying. He found that they did not contain *Brady* material and were not inconsistent with Officer Bradley's testimony. In another instance cited by defendant, a witness reviewed notes before coming to court and left the notes locked in his car. The court denied defendant's motion to view those notes. We cannot say that on these facts the trial court abused its discretion when it denied defendant's motion. This assignment of error is overruled.

## X.

[10] Finally, defendant assigns error to the trial court's failure to conduct an *in camera* review of grand jury members and witnesses who appeared before the grand jury, in order to determine the validity of the indictments returned against defendant. The purpose of the grand jury proceeding is to determine whether probable cause to bring charges exists. N.C. Gen. Stat. § 15A-628(a)(1) (1999). "The nature and character of the evidence presented to the grand jury is by statute secret." *State v. Jones*, 85 N.C. App. 56, 69, 354 S.E.2d 251, 258, *disc. reviews denied*, 320 N.C. 173-74, 358 S.E.2d 61-62, *cert.*

*denied,* 484 U.S. 969, 98 L. Ed. 2d 404 (1987). However, the defendant is protected " 'by his right to object to improper evidence and cross-examine the witnesses presented against him at trial.' " *Id.* (quoting *State v. Porter,* 303 N.C. 680, 689, 281 S.E.2d 377, 384 (1981)). This final assignment of error is overruled.

Defendant was accorded a trial free from prejudicial error before an able trial court and a jury of his peers. The judgments based on the verdicts of the jury are therefore affirmed.

No error.

Judges McGEE and EDMUNDS concur.